David **FLOYD**, Lalit **Clarkson**, Deon **Dennis**, and David **Ourlicht**, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The **CITY OF NEW YORK**, et al., Defendants.

No. 08 Civ. 1034(SAS).

United States District Court, S.D. New York.

Aug. 31, 2011.

Darius Charney, Esq., Sunita Patel, Esq., Taylor M. Hoffman, Esq., Covington & Burling LLP, Jonathan C. Moore, Esq., Rachel Kleinman, Esq., Beldock Levine & Hoffman LLP, New York, NY, for Plaintiffs.

Heidi Grossman, David M. Hazan, Linda Donahue, Judson Vickers, Assistant Corporation Counsel, New York City Law Department, New York, NY, for Defendants.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David Ourlicht bring this putative class action against the City of New York, Police Commissioner Raymond Kelly, Mayor Michael Bloomberg, and named and unnamed New York City Police Officers ("Defendants"), alleging that defendants have implemented and sanctioned a policy, practice, and/or custom of unconstitutional stops and frisks by the New York Police Department ("NYPD") on the basis of race and/or na-

tional origin, in violation of Section 1983 of title forty-two of the United States Code, the Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964,[1] and the Constitution and laws of the State of New York.[2] Plaintiffs seek equitable relief in the form of (1) a declaration that defendants' policies, practices, and/or customs violate the Fourth and Fourteenth Amendments, and (2) a class-wide injunction enjoining defendants from continuing such policies, practices, and/or customs.[3] Additionally, the named plaintiffs seek compensatory and punitive damages for themselves.[4] Defendants now move for summary judgment on certain of the claims of plaintiffs Floyd and Ourlicht, as well as on the claims of all plaintiffs against the City of New York, Mayor Michael Bloomberg, and Commissioner Raymond Kelly.[5]

This case presents an issue of great public concern. Writ large, that issue is the disproportionate number of African–Americans and Latinos who become entangled in our criminal justice system, as compared to Caucasians. The specific claims raised in this case are narrower—that there is a widespread pattern and practice of suspicionless and race-based stops and frisks by the NYPD. Nonetheless, these claims are raised in the larger context of the historically racialized nature of criminal justice in this country, and the extensively documented racial disparities in the rates of stops, arrests, convictions, sentences, and executions that continue through the present day.

---

1. 42 U.S.C. § 2000e(d) *et seq.*

2. *See* Second Amended Complaint ("Compl.") ¶¶ 2, 3.

3. *See id.* ¶ 7.

4. *See id.*

5. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem.") at 1. Defendants have not moved on the remaining five incidents in which plaintiffs allege unlawful stops and frisks, but have reserved their right to do so at a later time.

Relatedly, racial profiling—that is, stopping an individual on the basis of his race rather than on the basis of reasonable suspicion—has become a topic of significant debate over the past fifteen years. While it is generally accepted that racial profiling is wrong and prohibited by the United States Constitution, how to end the practice is a more difficult and delicate question.

Since the mid–1990s, New York City has experienced a precipitous decline in crime rates.[6] The reasons for this decline are not clear. Some claim that it results from innovative policing policies influenced by the "broken windows" theory of crime control, beginning under Mayor Rudolph Giuliani and Police Commissioner William Bratton, and continuing under current Mayor Michael Bloomberg and Police Commissioner Raymond Kelly.[7] Others argue that the drop in crime must be due to economic or other factors, as crime rates declined in cities nationwide during the same period, irrespective of variations in policing policies.[8]

In either case, it is clear that the policing policies that the City has implemented over the past decade and a half have led to a dramatic increase in the number of pedestrian stops, to the point of now reaching "almost 600,000 a year."[9] There is "a disturbingly large racial disparity in who is victimized by these practices,"[10] although the precise extent of the disparity and its causes are matters of dispute. While the City credits its "pre-emptive" policing, and accompanying high stop rates, for the decline in crime,[11] plaintiffs argue that African–American and Latino men have been the targets and borne the brunt of these policies, as hundreds of thousands of law-abiding citizens have been stopped, questioned, and frisked based, in large part, on their race.[12]

This is not the first time the City of New York has been accused of racial profiling. In particular, a previous lawsuit before this Court, *Daniels v. City of New York*,[13] was resolved through a settlement agreement requiring the City to adopt several remedial measures intended to reduce racial disparities in stops and frisks. Under the terms of that settlement, the NYPD enacted a Racial Profiling Policy; revised the UF250 form, otherwise known as a "Stop, Question and Frisk Report Worksheet,"[14] so that stops would be more accurately documented; and instituted

**6.** *See* 1999 Office of the Attorney General Report ("AG Report"), Ex. 117 to Declaration of Darius Charney, Plaintiffs' Counsel ("Charney Decl."), at 46; Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶¶ 96–98 (noting that in 1995, murder rates decreased 33.9 percent from the previous year, from 1,181 to 1,582; that in 2009, there were 471 murders, the lowest level since 1964; and that since 2003, crime has dropped approximately 76 percent).

**7.** *See* AG Report, at 46–56.

**8.** *See id.* at 46 n. 5.

**9.** Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp. Mem.") at 1.

**10.** *Id.*

**11.** *See* Def. 56.1 ¶¶ 92–190; Supplemental Report of Jeffrey Fagan, Ph.D ("Supp. Fagan Report"), in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at 1 n. 3.

**12.** *See* Compl. ¶ 6.

**13.** 99 Civ. 1695(SAS).

**14.** *See* Def. 56.1 ¶ 7; Plaintiffs' Reply Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 7.

regular audits of the UF250 forms, among other measures.[15]

Thus, clearly this is not a case where the City has failed to take *any* action to address the documented disparities. Yet plaintiffs contend that the City's actions have been woefully inadequate—in fact, so inadequate that the City has *constructively acquiesced* in a widespread pattern of unconstitutional stops and frisks, and exhibited *deliberate indifference* to the need for sufficient training, supervision, monitoring, and discipline to avert such constitutional violations, thereby warranting the imposition of municipal liability.[16] Notably, this is not a question of municipal liability for an unusual yet foreseeable violation—an accident waiting to happen-but rather for a situation that thousands of NYPD patrol officers confront on a daily basis: deciding whether they are justified in stopping a resident based on factors giving rise to reasonable suspicion.

As the Supreme Court recognized in *Terry v. Ohio*, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience."[17] Being stopped and frisked is a sufficiently unwelcome intrusion that the increasingly widespread use of this policing tool in New York City is not to be taken lightly, even in those cases in which the individuals are not detained for more than a few minutes, and even if the practice causes some reduction in the City's crime rate. It is deeply troubling if thousands of New Yorkers are being stopped each year without reasonable suspicion, and even more troubling if African–American and Latino New Yorkers are being singled out for such treatment. It is against this backdrop that I consider defendants' instant motion for summary judgment. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## II. BACKGROUND

Each of the named plaintiffs alleges that he was stopped, questioned, and frisked by the NYPD without reasonable suspicion on one or more occasions. In the instant motion, defendants challenge plaintiffs' claims with respect to two of those specific incidents—Floyd's February 2008 stop and Ourlicht's June 2008 stop.[18] In Floyd's case, the particular NYPD officers have been identified, while in Ourlicht's case, the officers have not been identified and defendants contest whether Ourlicht was in fact stopped by NYPD officers.[19]

In addition to their claims based on particular incidents, plaintiffs, individually and on behalf of a putative class, allege that the NYPD has engaged in an unconstitutional pattern and practice of using race and/or national origin rather than reasonable suspicion as the determinative factor in deciding whether to stop and frisk individuals, in violation of the Fourth Amendment.[20] Plaintiffs further allege that this pattern and practice, which principally victimizes African–American and Latino males, violates the Equal Protection Clause of the Fourteenth Amendment.[21]

---

**15.** *See* Def. 56.1 ¶¶ 6, 16, 22–23.

**16.** Opp. Mem. at 10.

**17.** 392 U.S. 1, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**18.** *See* Def. Mem. at 1 n. 2.

**19.** *See id.*

**20.** *See* Compl. ¶ 3.

**21.** *See id.* The parties use the terms Black/African–American, Hispanic/Latino, and White/Caucasian interchangeably, and I have followed suit.

Plaintiffs contend that these constitutional violations are "the result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented and enforced by the City, Commissioner Kelly and [Mayor] Bloomberg." [22] Specifically, they allege that the City, Commissioner Kelly and Mayor Bloomberg have acted with deliberate indifference by

(a) failing to properly screen, train, and supervise NYPD officers, (b) inadequately monitoring NYPD officers and their stop and frisk practices, (c) failing to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning, and failing to rectify the NYPD's unconstitutional practices.[23]

### A. The February 2008 Incident Alleged by Floyd

Floyd, an African–American man, testified that on February 27, 2008, he was walking on the path adjacent to the house in which he lived at 1359 Beach Avenue in the Bronx, New York.[24] He encountered the basement tenant, also an African–American man, who indicated that he was locked out of his apartment and asked for help.[25] Floyd, whose godmother owned the building, went upstairs to retrieve the key.[26] Unsure of the correct key for the basement lock, he retrieved seven to ten keys, some on chains and some loose, which he took back outside with him.[27] Floyd and the tenant went to the basement apartment door and started trying the various keys.[28] After trying five or six keys, they found the correct one.[29]

However, before they could open the door, three NYPD officers approached them—Officer Joyce, Officer Hernandez, and Sergeant Kelly.[30] The officers asked the two men what they were doing, told them to stop, and proceeded to frisk them.[31] The officer who frisked Floyd reached into both of his front pockets, which contained a phone, his keys, and some change.[32] The officers then turned the two men around and asked again what they were doing.[33] The officers asked the men to produce identification and asked why the basement tenant did not have any.[34] The officers asked whether the two men lived there.[35] Floyd gave the officers his Louisiana driver's license and when the officers noted that the address on the license did not match the address of the building, he retrieved a bill from his bag, which reflected the building address.[36]

Officer Joyce testified that he stopped Floyd because he believed Floyd was in the middle of committing a burglary; he saw Floyd jostling a doorknob and ner-

---

22. *Id.* ¶ 4.

23. *Id.*

24. *See* Def. 56.1 ¶ 438; Pl. 56.1 ¶ 438; Compl. ¶ 13.

25. *See* Def. 56.1 ¶ 438; Pl. 56.1 ¶ 438.

26. *See id.;* Compl. ¶ 50.

27. *See* Def. 56.1 ¶ 439; Pl. 56.1 ¶ 439.

28. *See* Def. 56.1 ¶ 440; Pl. 56.1 ¶ 440.

29. *See* Def. 56.1 ¶ 442; Pl. 56.1 ¶ 442.

30. *See* Def. 56.1 ¶¶ 442, 456, 457, 463; Pl. 56.1 ¶¶ 442, 456, 457, 463.

31. *See* Def. 56.1 ¶ 445; Pl. 56.1 ¶ 445.

32. *See* Def. 56.1 ¶¶ 446–447; Pl. 56.1 ¶¶ 446–447.

33. *See* Def. 56.1 ¶ 448; Pl. 56.1 ¶ 448.

34. *See id.*

35. *See id.*

36. *See* Def. 56.1 ¶ 449; Pl. 56.1 ¶ 449.

vously looking back; and he believed there had been a burglary pattern for that time of day in the neighborhood.[37] Joyce recorded Floyd's stop and frisk on a UF250 form, indicating that the suspected crime was burglary.[38] He also noted in the box for "Physical Force Used" that he had put his hands on Floyd while Floyd was up against a wall.[39] Regarding the circumstances that led to arrest, Joyce checked the box corresponding to "Furtive Movements."[40] In the area of the form entitled "Additional Circumstances/Factors," with instructions to "Check All That Apply," Joyce checked the box corresponding to "Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity," as well as the boxes corresponding to "Evasive, False, Or Inconsistent Responses To Officer's Questions," and to "Ongoing Investigations, e.g., Robbery Pattern," but did not check the box corresponding to "Area Has High Incidence Of Reported Offense Of Type Under Investigation."[41] In response to the question "Was Person Searched?," Joyce checked "No."[42]

Officer Hernandez testified that he suspected Floyd of committing a burglary because he saw two men focused on the front door very close to each other with their hands playing with the lock; because

he saw one of the two men look toward the street and then focus back on the door, as if looking to see if anyone was looking at them; and because he knew there had been burglaries in the 43rd Precinct.[43] He also testified that Floyd was holding a key ring that looked like it had been made with a wire hanger with more than fifty keys on it.[44] He did not see a bulge in the clothing of either man that might indicate possession of a weapon.[45]

Sergeant Kelly testified that he suspected that the two men were committing a burglary because he saw them fumbling with a lock and jostling a door, and because he knew there was a burglary pattern in the neighborhood.[46] He suspected that the bag at the men's feet might have contained burglary tools.[47] He testified that as he was approaching the two men, he noticed that one of them "was holding a very large key chain with … numerous keys on it, raising [his] suspicion that maybe they were using several keys to try to get into that house."[48] He reasoned that if they were in the process of committing a home invasion, they might have a weapon.[49] Kelly filled out a UF250, but did not make an entry in his memo book regarding the stop and frisk of Floyd.[50]

**37.** *See* Def. 56.1 ¶ 457 (citing 8/25/09 Deposition of NYPD Officer Cormac Joyce ("Joyce Tr.") at 126:10–128:19); Pl. 56.1 ¶ 457.

**38.** *See* Def. 56.1 ¶ 458; Pl. 56.1 ¶ 458.

**39.** *See* Def. 56.1 ¶ 460; Pl. 56.1 ¶ 460; UF250 Form completed by Officer Joyce on 2/27/08 ("Joyce UF250"), Ex. 170 to Charney Decl.

**40.** Joyce UF250.

**41.** *Id.*

**42.** *Id.*

**43.** *See* Def. 56.1 ¶ 461 (citing 8/5/09 Deposition of NYPD Officer Eric Hernandez ("Hernandez Tr.") at 140:21–141:9; 153:8–154:2; 169:2–19); Pl. 56.1 ¶ 461.

**44.** *See* Hernandez Tr., Ex. 57 to Charney Decl., at 145:21–25.

**45.** *See* Def. 56.1 ¶ 462; Pl. 56.1 ¶ 462.

**46.** *See* Def. 56.1 ¶ 463 (citing 8/7/09 Deposition of NYPD Sergeant James Kelly ("Kelly Tr."), Ex. 67 to Charney Decl., at 32:25–33:25, 37:7–15, 38:24–39:18); Pl. 56.1 ¶ 463.

**47.** *See* Def. 56.1 ¶ 464; Pl. 56.1 ¶ 464.

**48.** Kelly Tr. at 44:3–10.

**49.** *See* Def. 56.1 ¶ 465; Pl. 56.1 ¶ 465.

**50.** *See* Def. 56.1 ¶ 467; Pl. 56.1 ¶ 467.

All three officers testified to the effect that they were unaware of any quotas or expectations that they complete a certain number of stops or UF250s per tour or per month.[51] However, various other NYPD officers testified that they have been instructed to complete a certain number of stops or arrests, or to issue a certain number of summonses, per tour or per month; and certain supervisors have testified they have so instructed their subordinates.[52] Plaintiffs have also submitted audio recordings on which various precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses during roll call.[53] In addition, plaintiffs state that in May 2004, the Patrolmen's Benevolent Association filed a labor grievance on behalf of six officers and one sergeant who were transferred out of the 75th precinct for allegedly failing to meet a ten summons-per-month quota.[54] In January 2006, a labor arbitrator found that the 75th precinct had imposed summons quotas on its officers in violation of New York State labor laws.[55]

NYPD Officer Adhyl Polanco testified that when he was a patrol officer in the 41st Precinct, he witnessed his fellow officers illegally stop, search, handcuff, and charge minority residents with crimes;[56] he witnessed fellow officers stop civilians without reasonable suspicion and issue summonses without probable cause;[57] and on several occasions, he and his fellow officers were ordered by supervisors to fill out and sign UF250 forms for stops and frisks that they did not conduct or observe and to issue criminal court summonses for incidents they did not observe.[58] Polanco further testified that while at the 41st Precinct, he issued at least ten summonses when he knew he did not have probable cause to do so.[59]

51. *See* Def. 56.1 ¶¶ 469–474; Pl. 56.1 ¶¶ 469–474.

52. *See* Plaintiffs' 56.1 Additional Facts ("PAF") ¶¶ 55–63 (citing, *inter alia,* Deposition of NYPD Inspector Dwayne Montgomery ("Montgomery Tr"), Ex. 6 to Charney Decl., at 200:23–203:20, 209:15–210:12; Deposition of NYPD Officer Luis Pichardo ("Pichardo Tr."), Ex. 68 to Charney Decl., at 218:9–219:12; Deposition of NYPD Officer Adhyl Polanco ("Polanco Tr."), Ex. 76 to Charney Decl., 22:2–24:17, 25:11–17, 26:2–9, 28:14–29:10, 32:6–33:3, 48:10–50:10; Affirmation of Officer Polanco ("Polanco Aff."), Ex. A to Declaration of Taylor Hoffman ("Hoffman Decl."), Plaintiffs' Counsel, ¶¶ 4–5, 7; Deposition of Sergeant Mervin Bennett (Confidential), Ex. 99 to Charney Decl., at 73:16–76:10; Deposition of Officer Angel Herran (Confidential), Ex. 100 to Charney Decl., at 26:13–29:2, 54:22–55:2; Deposition of Deputy Inspector Donald McHugh, at 52:8–56:21, 73:2–78:8, 88:3–95:5). *See also id.* ¶¶ 79–82 (asserting that NYPD Chief of Department Joseph Esposito told Deputy Inspector Charles Ortiz that "his officers did not have enough enforcement activity, particularly criminal court summonses and stops-and-frisks, in a particular zone within the precinct in the preceding month,"

and that Ortiz has "told individual officers on more than ten occasions that their monthly enforcement activity ... was too low" and told squad supervisors the same).

53. *See id.* ¶¶ 64–69 (citing CD Bates-numbered NYC_2_19010, Ex. 1 to Polanco Aff.); *id.* ¶¶ 87–92 (citing CD Bates-numbered PL000093, Ex. 1 to Affirmation of NYPD Officer Adrian Schoolcraft ("Schoolcraft Aff."), Ex. B to Hoffman Decl.).

54. *See id.* ¶ 83.

55. *See id.* ¶ 84.

56. *See id.* ¶ 73 (citing Polanco Tr. at 18:5–22).

57. *See id.* ¶ 74 (citing Polanco Tr. at 52:14–53:8; 143:12–146:13; 148:7–149:9).

58. *See id.* ¶ 75 (citing Polanco Tr. at 87:23–88:5, 122:23–126:12, 134:9–136:6, 137:23–143:11; Deposition of NYPD Officer Victor Marrero ("Marrero Tr."), Ex. 101 to Charney Decl., at 64:2–23).

59. *See id.* ¶ 78 (citing Polanco Tr. at 168:5–11).

## B. The June 2008 Incident Alleged by Ourlicht

David Ourlicht, who is of African–American and Italian ancestry, testified that around 10 a.m. on the morning of either June 6 or June 9, 2008,[60] he was sitting on a bench with an African–American male friend, outside the Johnson public housing complex in Harlem, New York.[61] There were three other African–American men sitting in the same area.[62]

After sitting on the bench for about ten minutes, Ourlicht noticed two male uniformed police officers walking through the housing complex.[63] When the two officers reached the corner, they turned, drew their weapons and screamed " 'Get on the floor, get on the floor!' and 'There's a gun around here. Everybody get on the floor!' " [64] At the same time, a blue and white police van marked 9466 arrived and three or four officers exited the van.[65] All of the police officers were running and had their guns out.[66] The officers told Ourlicht that they had received reports that there was a gun in the vicinity.[67] The officers patted Ourlicht down, lifted him by the belt, "check[ed] underneath [him], and check[ed his] pockets." [68] The other individuals sitting outside were also told to lie on the ground, were lifted by their belts, and were searched.[69] After the men had been lying on the ground for about ten minutes, the officers told them they could get up.[70] The officers asked all of the men for their names and identification.[71] At least two officers entered the nearby building.[72] No evidence has been produced in this action to support the notion that the police received a report of a gun in Ourlicht's vicinity on June 6 or June 9, 2008, or that a gun was ever recovered from the area.[73]

Ourlicht testified that all of the police officers at the scene were White men in dark blue uniforms with NYPD patches.[74] On August 24, 2009, Ourlicht participated in a photo array procedure with his counsel and defendants' counsel in an attempt to identify the officers who were involved with the June 2008 stop.[75] Ourlicht viewed

---

**60.** The parties have been unable to determine definitively if the incident occurred on June 6 or June 9, 2008. *See* Def. 56.1 ¶ 477; Pl. 56.1 ¶ 477.

**61.** *See* Def. 56.1 ¶¶ 475, 478, 480; Pl. 56.1 ¶¶ 475, 478, 480; 5/14/09 Deposition of Plaintiff David Ourlicht ("Ourlicht Tr."), Ex. 81 to Charney Decl., at 96:11–21.

**62.** *See* Def. 56.1 ¶ 479; Pl. 56.1 ¶ 479.

**63.** *See* Def. 56.1 ¶ 481; Pl. 56.1 ¶ 481.

**64.** Def. 56.1 ¶ 483 (quoting Ourlicht Tr. at 163:13–22); Pl. 56.1 ¶ 483.

**65.** *See* Def. 56.1 ¶ 484; Pl. 56.1 ¶ 484.

**66.** *See* Def. 56.1 ¶ 485; Ourlicht Tr. at 164:3–23; *but see* Pl. 56.1 ¶ 485 (denying that Ourlicht testified clearly which officers had their guns out).

**67.** *See* Def. 56.1 ¶ 487; Pl. 56.1 ¶ 487.

**68.** *See* Def. 56.1 ¶ 488 (quoting Ourlicht Tr. at 167:17–20); Pl. 56.1 ¶ 488.

**69.** *See* Def. 56.1 ¶ 489; Ourlicht Tr. at 165:23–25; *but see* Pl. 56.1 ¶ 489 (denying that Ourlicht testified that everyone present during the incident was treated in the same manner).

**70.** *See* Def. 56.1 ¶ 490; *but see* Pl. 56.1 ¶ 490 (denying that Ourlicht testified that everyone was treated in the same manner).

**71.** *See* Def. 56.1 ¶¶ 492–493; Pl. 56.1 ¶¶ 492–493.

**72.** *See* Def. 56.1 ¶¶ 494–495; Pl. 56.1 ¶¶ 494–495.

**73.** *See* PAF ¶¶ 308–310.

**74.** *See* Def. 56.1 ¶ 486; Pl. 56.1 ¶ 486.

**75.** *See* Def. 56.1 ¶ 496; Pl. 56.1 ¶ 496; PAF ¶ 319.

a total of four hundred and two photographs and indicated eleven officers who he thought might have been present at the time of the incident.[76] Of those eleven officers, only one was assigned to PSA 5 at the time of the incident.[77] That officer—Sergeant Gordon Pekusic—did not record in his memo book that he was at the site of the alleged incident on June 6, 2008, and on June 9, 2008, he was the desk sergeant.[78] However, plaintiffs contend that "[n]othing in his memo book or any other documents produced in the course of this litigation precludes a desk officer from also participating in law enforcement activity." [79] The other ten officers were either not employed by the NYPD at the time of the incident or were not assigned to PSA 5 at the time.[80] During a January 12, 2010 photo array procedure with his counsel, Ourlicht identified officers who may have been involved in the stop as including Officer Campos, Officer Kennedy, Officer Mifsud, and Sergeant Pekusic.[81]

Van 9466, in which Ourlicht claimed some of the officers arrived at the scene, is assigned to PSA 5.[82] The memo books and records of the officers who were assigned to Van 9466 on June 6, 2008—Officers Negron, Delgado, and Goris—show that they were in the van on truancy patrol and picked up several truants between 9 a.m. and 10:35 a.m.[83] The memo books and records of the officers who were assigned to Van 9466 on June 9, 2008—Officers Crawford and Socorro—show that around the time of the stop, the van was at Bellevue Hospital and then at the 7th Precinct and Manhattan Central Booking in lower Manhattan.[84] In a photo array procedure conducted on August 24, 2009, Ourlicht did not recognize any of the officers assigned to Van 9466 on either date.[85] Plaintiffs note that "[n]either the Van Assignment Sheet for June 6, 2008, nor the roll call for June 6, 2008, specify which officer was assigned to the van or exclude any officers not assigned to truancy from using the vehicle." [86]

## C. NYPD's Racial Profiling Policy

As part of the Stipulation of Settlement entered into on September 24, 2003 in *Daniels v. City of New York*, the NYPD developed and implemented a Racial Profiling Policy.[87] That policy "prohibits the use of race, color, ethnicity or national origin as a determinative factor in taking law enforcement action," though those markers may be used to identify a suspect in the same way that pedigree information (height, weight, and age, etc.) is used.[88]

76. *See* Def. 56.1 ¶ 504; Pl. 56.1 ¶ 504.

77. *See* Def. 56.1 ¶ 505; Pl. 56.1 ¶ 505. It appears that PSA 5 is the NYPD command that has jurisdiction over the location where this incident occurred.

78. *See* Def. 56.1 ¶¶ 506–507; Pl. 56.1 ¶ 507.

79. Pl. 56.1 ¶ 506.

80. *See id.*

81. *See* PAF ¶ 319. Defendants were apparently not present for this latter photo array procedure. *See* Def. 56.1 ¶ 508.

82. *See* Def. 56.1 ¶¶ 510–511; Pl. 56.1 ¶¶ 510–511; PAF ¶¶ 312, 323.

83. *See* Def. 56.1 ¶ 511; Pl. 56.1 ¶ 511.

84. *See* Def. 56.1 ¶ 510; Pl. 56.1 ¶ 510.

85. *See* Def. 56.1 ¶ 512; Pl. 56.1 ¶ 512.

86. *See* PAF ¶ 318.

87. *See* Def. 56.1 ¶¶ 16–17; Pl. 56.1 ¶¶ 16–17.

88. Def. 56.1 ¶¶ 18–19 (citing Racial Profiling Policy, Ex. B to Declaration of Heidi Grossman, Defendants' Counsel ("Grossman Decl."), in support of Defendants' Motion for Summary Judgment); Pl. 56.1 ¶¶ 18–19.

The Racial Profiling Policy further requires that commanding officers establish self-inspections within their command to monitor compliance with the policy; that the NYPD Quality Assurance Division ("QAD") audit compliance with the self-inspection directive; and that CompStat review include consideration of "performance in this area."[89]

## D. Training, Monitoring, Supervision, and Discipline

The parties have made voluminous submissions to the Court in support of and in opposition to summary judgment. Defendants cite numerous examples of NYPD policies regarding training,[90] monitoring,[91] supervision,[92] and discipline,[93] to rebut plaintiffs' allegations of municipal liability for widespread constitutional violations. Plaintiffs' response in each case is that such measures may indeed reflect NYPD *policy,* but that NYPD *practices* fall far short of those goals.[94] For every officer whose testimony defendants cite in support of the existence of such policies, plaintiffs respond with testimony from another officer who testified that he has never heard of, seen, or been instructed with regard to those policies. While defendants have submitted extensive written and au-

diovisual training materials as evidence that NYPD training is sufficient, plaintiffs have submitted written and audio evidence that there is significant pressure on commands and officers to produce stops, summonses, and arrests, whether or not they are constitutionally justified, in contravention of those training materials. Defendants describe numerous forms and layers of disciplinary procedure, while plaintiffs present evidence that little discipline is actually meted out.

In short, there are numerous disputed issues of fact as to the constitutional sufficiency of the NYPD's *practice* of training, monitoring, supervising, and disciplining its officers for stops and frisks[95] conducted in violation of the Fourth Amendment. I describe below the evidence submitted regarding the sufficiency of the NYPD's training and monitoring, to illustrate the kinds of conflicting evidence that have been presented to the Court in the parties' submissions. Similarly conflicting evidence was submitted regarding the adequacy of supervision and discipline within the NYPD, which I will not detail here for expediency's sake.

### 1. Training

New NYPD recruits spend six months in training at the Police Academy.[96] De-

---

**89.** Racial Profiling Policy. *Accord* Def. 56.1 ¶¶ 20–21; Pl. 56.1 ¶¶ 20–21. CompStat is an abbreviation for "COMPuter STATistics or COMParative STATistics," an NYPD process that uses "Geographic Information Systems [to] map crime and identify high-crime and problematic areas." Def. 56.1 ¶¶ 92–93.

**90.** *See* Def. 56.1 ¶¶ 191–246; Pl. 56.1 ¶¶ 191–246; PAF ¶¶ 166–198.

**91.** *See* Def. 56.1 ¶¶ 2–59; Pl. ¶¶ 2–59; PAF ¶¶ 1–54.

**92.** *See* Def. 56.1 ¶¶ 247–301; Pl. 56.1 ¶¶ 247–301; PAF ¶¶ 159–165. *Cf.* PAF ¶¶ 55–100 (presenting facts to support plaintiffs' allegations that top-down pressure to increase en-

forcement activity and stop/summons/arrest quotas lead to widespread unconstitutional stops).

**93.** *See* Def. 56.1 ¶¶ 304–437; Pl. 56.1 ¶¶ 304–437; PAF ¶¶ 200–279.

**94.** *See, e.g.,* Opp. Mem. at 20 ("Defendants rely primarily on their formal written policies, and do not in any meaningful way dispute Plaintiffs' evidence regarding the *practices* of NYPD supervisors and officers with respect to training, supervision, monitoring and discipline.").

**95.** The parties use the terms "stop and frisk," "stop, question, and frisk" and "SQF" interchangeably, and I have followed suit.

fendants assert that the Academy training addresses stop, question and frisks; reasonable suspicion; probable cause; racial profiling; policing impartially; and policing professionally.[97] They cite numerous training materials in support, primarily from the Police Student's Guide.[98] However, plaintiffs contend that "[t]he documents cited by defendants may reflect the policy of the NYPD but they do not contain evidence about the NYPD's practice or custom with respect to training." [99] Plaintiffs assert further that "[r]ecruits are not trained using the documents cited by [d]efendants," referring to the testimony of three officers who did not recall seeing those documents while at the Academy.[100]

Defendants also cite the testimony of officers in support of their assertion that Police Academy cadets receive training on SQF procedures, documentation requirements for SQFs, and "the legal bases for stops, including the standards for the common law right of inquiry, reasonable suspicion and probable cause." [101] Plaintiffs accept that those officers testified as quoted,

but cite numerous examples of testimony by other NYPD officers that they did not receive that training at the Academy, or did not remember if they received the training at the Academy.[102] Defendants state that "[o]fficers testified about their understanding of the law of reasonable suspicion," citing the testimony of thirty-five police officers.[103] Plaintiffs deny that the quoted testimony supports defendants' assertion, and contend that "many of the same officers that Defendants cite cannot explain reasonable suspicion or the factors or evidence that may lead an officer to have reasonable suspicion." [104]

Similarly, defendants assert that officers are instructed while in the Academy that racial profiling is prohibited, citing the testimony of three officers.[105] However, plaintiffs counter with citations to the testimony of nine officers, who testified to a lack of familiarity with the NYPD's Racial Profiling Policy or lack of memory of racial profiling training.[106] Defendants also assert that NYPD recruits "are instructed to document their activity in an activity

**96.** *See* Def. 56.1 ¶ 195.

**97.** *See id.*

**98.** *See id.*

**99.** Pl. 56.1 ¶ 195.

**100.** *Id.* (citing Joyce Tr. at 166:18–167:13; Hernandez Tr. at 214:7–23; Deposition of Sergeant Patrick Hegney ("Hegney Tr."), Ex. 9 to Charney Decl., at 103:11–103:15).

**101.** *See* Def. 56.1 ¶¶ 238–239 (citing the testimony of Joyce, Moran, Pichardo, Albano, Eddy, Tzimorotas, Noboa, Gonzalez, Navaretta, Trunzo, Blakely, Pillai–Abdul, and Herran).

**102.** *See* Pl. 56.1 ¶¶ 238–239 (citing the testimony of Salmeron, Eddy, and Hegney); *see also* PAF ¶¶ 166–167, 174 (citing the testimony of Salmeron, Eddy, Moran, Cousin–Hayes, Hegney, Kelly, Rodriguez, Navaretta, Polan-

co, Velasquez, Hernandez, Joyce, Gonzalez, Pillai–Abdul, and Pichardo).

**103.** *See* Def. 56.1 ¶ 237 (citing the testimony of Salmeron, Moran, Pichardo, Ruggiero, Cousin–Hayes, Hegney, Giannelli, Joyce, Riley, Eddy, Barrelli, Ortiz, Guimaraes, Cirabisi, Peters, McCarthy, Dale, Esposito, Conaghan, Tzimorotas, Dang, Noboa, Rodriguez, Gonzalez, Telford, Farrell, Hu, Trunzo, Blakely, Velazquez, Salmeron, Navaretta, Pillai–Abdul, and Agron).

**104.** Pl. 56.1 ¶ 237 (citing the testimony of Salmeron, Moran, Pichardo, Ruggiero, Cousin–Hayes, Hegney, Giannelli, Joyce, Riley, Eddy, Barrelli, Ortiz, Peters, McCarthy, Navaretta, Pilai–Abdul, and Agron).

**105.** *See* Def. 56.1 ¶ 202 (citing the testimony of Joyce, Moran, and Eddy).

**106.** *See* Pl. 56.1 ¶ 202; *see also* PAF ¶ 175.

log."[107] However, plaintiffs contend that "[w]hile there may be a written policy instructing officers to document their activity in an activity log, as a matter of practice, officers are not so instructed," citing the testimony of five officers who testified to a lack of memory as to whether it is required to record stops in their activity logs.[108]

Defendants assert that officers continue to receive training—including on stop-and-frisk procedures—throughout their careers.[109] Plaintiffs contend that "[a]s a matter of practice, NYPD officers do not receive post-Academy training on SQF procedures," citing the testimony of numerous officers.[110] Defendants assert that officers assigned to Operation Impact receive Impact Training from training sergeants, including on SQF procedures.[111] Plaintiffs maintain, citing the testimony of numerous officers, that "as a matter of practice, officers do not receive such training" and "training sergeants do not cover SQF procedures."[112]

Defendants likewise contend that officers assigned to specialized units, such as the plainclothes unit, receive training in SQF procedures and the law of reasonable suspicion.[113] Plaintiffs dispute that representation, citing the testimony of numerous officers who do not recall receiving SQF or UF250 training during plainclothes training.[114] Defendants assert that newly promoted sergeants and lieutenants receive tailored "[p]romotional training," which covers "the law of reasonable suspicion, SQF, management skills and proper documentation."[115] Plaintiffs cite the testimony of various officers to support their assertion that officers who have gone through such training have not, in fact, received training on the law of reasonable suspicion, SQF, or proper documentation.[116]

## 2. Monitoring

The QAD audits mandated by the NYPD's Racial Profiling Policy are annual, random, and Department-wide.[117] Defendants assert that these audits "evaluate compliance with the Racial Profiling Policy

**107.** Def. 56.1 ¶ 206.

**108.** Pl. 56.1 ¶ 206 (citing the testimony of Joyce, Gonzalez, Salmeron, Moran, and Palmieri).

**109.** *See* Def. 56.1 ¶¶ 207–210 (citing the testimony of Lieutenant Daniel Albano; NYPD Stop, Quest & Frisk Training Videos (N.Y.C_2_00004238); and Chief of Patrol Field Training Unit Program Guide 2009, July 2009 ed.).

**110.** Pl. 56.1 ¶ 209 (citing Hegney Tr. at 121:23–122:11). *Accord* PAF ¶ 167 (citing the testimony of Hegney, Kelly, Rodriguez, Moran, Navaretta, Cousin–Hayes, Polanco, Velazquez, Hernandez, Joyce, Gonzalez, Pillai–Abdul, and Pichardo).

**111.** *See* Def. 56.1 ¶¶ 212, 217, 219 (citing the testimony of Lieutenant Albano).

**112.** Pl. 56.1 ¶¶ 217, 219 (citing the testimony of Moran, Joyce, Kelly, Hernandez, and

Eddy). *Accord* PAF ¶ 170 (citing the testimony of Hegney, Agron, Navaretta, Conaghan, Eddy, Pichardo, Moran, Gonzalez, and Polanco).

**113.** *See* Def. 56.1 ¶¶ 223, 225 (citing the testimony of Lieutenant Albano, various Lesson Plans and Lesson Cover Sheets).

**114.** *See* Pl. 56.1 ¶ 225 (citing the testimony of Conaghan, Telford, Salmeron, and Hernandez).

**115.** Def. 56.1 ¶¶ 228–229 (citing the testimony of Lieutenant Albano and two Sergeants Leadership Course Lesson Plan Cover Sheets, http://www.nyc.gov/htmlinypd/html/training_nypd/Leadership% 20Development% 20Section.shtml).

**116.** *See* Pl. 56.1 ¶ 229 (citing the testimony of Hegney, Kelly, Agron, and Rodriguez).

**117.** *See* Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.

by auditing the Department's Stop, Question and Frisk Practices."[118] However, plaintiffs contend that the audit protocol does not, in practice, test "whether stop, question and frisk activity is based on reasonable suspicion as reflected in the UF250 forms."[119] Plaintiffs cite testimony of NYPD Inspector Peter Cassidy, who was QAD's commanding officer when the audit protocols were developed, and of NYPD Inspector Mary Cronin, QAD's current commanding officer, in which both convey that the audit aims merely to ensure that officers are filling out UF250 forms appropriately.[120]

Similarly, defendants assert that Worksheet Nos. 802 and 802A were developed to guide evaluation of the "quality of the UF250 forms and compliance with the Racial Profiling Policy and Patrol Guide Procedure 212–11" in the commands' self-inspections.[121] However, plaintiffs contend that the two worksheets do not "evaluate whether a stop-and-frisk recorded in a UF250 form was based on reasonable suspicion," and do not "evaluate compliance with the Racial Profiling Policy."[122] Instead, they assert that the two worksheets "seek[ ] only to determine whether the form was completely filled out."[123]

Defendants also assert that Worksheet 802 guides QAD to "inspect[ ] 5 UF250 forms and examine[ ] the reporting officer's [a]ctivity [l]og ... to see if corresponding entries detailing the circumstances of the stop were made relating to the stop, question and frisk report prepared."[124] However, plaintiffs note that "contrary to formal written NYPD policy, QAD has as a matter of practice not required [that] [a]ctivity [l]og entr[ies] provide any more detail about the circumstances of a stop than is provided on the UF250 form documenting that same stop."[125]

Defendants further assert that the monthly command self-inspections using Worksheet 802 require that the precinct's Integrity Control Officer ("ICO") examine the last twenty-five UF250 forms completed to assess whether all applicable captions have been filled out, "with added emphasis placed on a supervisor's review and those captions documenting the crime suspected[.]"[126] Plaintiffs counter that "Inspector Cronin testified that whether the circumstances checked off on the UF250 form correspond to the suspected crime listed on the UF250 form is merely 'one of the things that is looked at' in the 802 self-inspection."[127]

---

**118.** Def. 56.1 ¶ 26.

**119.** Pl. 56.1 ¶ 26. *Accord id.* ¶ 29.

**120.** *See* Pl. 56.1 ¶ 26 (quoting 10/25/05 Deposition of NYPD Inspector Peter Cassidy ("Cassidy Tr."), Ex. 10 to Charney Decl., at 103:20–105:24; 3/22/10 Deposition of NYPD Inspector Mary Cronin ("Cronin Tr."), Ex. 4 to Charney Decl., at 238:23–239:5).

**121.** Def. 56.1 ¶ 31. *Accord id.* ¶¶ 33, 35–40.

**122.** Pl. 56.1 ¶ 31.

**123.** *Id.* ¶¶ 32, 38.

**124.** Def. 56.1 ¶ 33. The term "activity log" is synonymous with "memo book."

**125.** Pl. 56.1 ¶ 33. *Accord* PAF ¶ 12.

**126.** 126 Def. 56.1 ¶ 36.

**127.** Pl. 56.1 ¶ 36 (quoting Cronin Tr. at 49:17–49:21). The UF250 form includes lines for the name and signature of a supervisor to indicate that he has reviewed the form. *See, e.g.,* Joyce UF250. Plaintiffs argue that the testimony of Inspector Cronin, which defendants have cited, does not support defendants' assertions. *See id.* However, they ignore that defendants have also cited the Audit Protocol at Bates No. NYC 037891 at ¶ 2c, which does indicate that the self-inspection will include a determination "[t]hat all applicable captions have been completed, with added emphasis placed on supervisor's review and captions documenting a Level III type of encounter

ICOs or their designees are likewise required to examine their commands' last five arrests each month for specified offenses and note on Worksheet 802A any failures to complete a UF250 form when required.[128] Defendants assert that the 802A self-inspection "helps test an officer's ability to identify reasonable suspicion to initiate a stop."[129] However, plaintiffs observe that for a police-initiated stop and frisk, the ICO is required to review only the UF250 form, which provides insufficient information to evaluate whether the stop and frisk was based on reasonable suspicion.[130] Defendants maintain that "[b]ecause the information indicated by the checkmarks on the UF250 represents substantive justification for a stop, the audit confirms that a UF250 with the required checkmarks indicates a valid stop, absent indicia to the contrary on the remainder of the form."[131]

QAD also audits whether commands are conducting self-inspections.[132] A total of one hundred and thirty-six commands/units are audited.[133] Plaintiffs highlight that from 2006 through 2009, forty-three commands/units received overall unsatisfactory ratings: twelve commands in 2006, twelve in 2007, seven in 2008, and eight in 2009.[134] Furthermore,

the "vast majority" of commands/units received unsatisfactory ratings for activity log entry.[135] A score of below 3.0 on any individual item of the audit is considered unsatisfactory, and the City-wide average rating for all commands/units for activity log entry was 1.7 in 2003, 1.9 in 2004, 1.5 in 2005, 1.4 in 2006, 1.5 in 2007, 2.5 in 2008 and 1.6 in 2009.[136]

Defendants assert that QAD directed those commands with noted deficiencies in the preparation of activity logs to take corrective action.[137] Plaintiffs counter that QAD did not direct those commands with deficient activity log entries to take any corrective action, if those commands earned satisfactory ratings in all other audit categories.[138] Defendants assert that in 2008, 2009, and 2010, memos were sent through the NYPD chain of command regarding noted deficiencies; commands "were expected to and did implement corrective measures."[139] Plaintiffs contend that the memos cited by defendants indicated specific deficiencies but did not direct that any corrective action be taken.[140] Plaintiffs note further that Deputy Inspector Steven Cirabisi, commander of the 107th Precinct—which received an unsatisfactory rating for activity log entries but an overall satisfactory rating on the 2008

('Specify Felony/Misdemeanor Suspected' and 'What Were Circumstances Which Lead to Stop')."

**128.** *See* Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39.

**129.** Def. 56.1 ¶ 140.

**130.** *See* Pl. 56.1 ¶ 40.

**131.** Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment ("Reply Mem.") at 11 n. 23.

**132.** *See* Def. 56.1 ¶ 41 (citing Cronin Tr. 36:9–25, 37:19–38:12 ("[W]e're checking up to see if the command is doing self-inspection in regards to that 802–A")). *But see* Pl. 56.1

¶ 41 (denying that the cited testimony supports defendants' assertion).

**133.** *See* Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.

**134.** *See* Pl. 56.1 ¶ 46.

**135.** *Id.*

**136.** *See id.*

**137.** *See* Def. 56.1 ¶ 50.

**138.** *See* Pl. 56.1 ¶¶ 50–51.

**139.** Def. 56.1 ¶¶ 52–53.

**140.** *See* Pl. 56.1 ¶ 53.

QAD stop and frisk audit—did not receive any recommendations or directives about addressing specific deficiencies.[141]

In March 2008, QAD instituted a new self-inspection protocol, Worksheet 803, geared toward improving compliance with the required completion of activity log entries.[142] The worksheet instructs the command to review three UF250 forms prepared by three different officers, and to determine whether their activity logs include "a log entry . . . detailing the circumstances of the stop."[143] QAD monitors whether commands are conducting these self-inspections through their Maintenance of Records Audit.[144]

Defendants assert that "[a]n [a]ctivity [l]og/memobook which contains the fact of a stop or certain details, but which does not note the details of the circumstances of a stop, question and frisk may receive an unsatisfactory rating."[145] Plaintiffs counter, however, that "as a matter of NYPD practice, stop-and-frisk activity log entries need not contain any more detail about the circumstances of a stop than what is contained in the corresponding UF250 form in order to receive a satisfactory rating on the Worksheet 803 self-inspection."[146]

### E. RAND Report and Fagan Report [147]

In addition to disputing the adequacy of the NYPD's monitoring, training, supervision, and discipline, the parties also dispute the extent of the racial disparities in NYPD stop and frisk numbers. Defendants rely upon the results of a 2007 study commissioned by the New York Police Foundation and conducted by the RAND Center on Quality Policing, published as *Analysis of Racial Disparities in the New York Police Department's Stop, Question and Frisk Policies* ("RAND Report").[148]

141. *See id.* (citing 10/30/09 Deposition of Deputy Inspector Steven Cirabisi ("Cirabisi Tr."), Ex. 5 to Charney Decl., at 115:25–118:16).

142. *See* Def. 56.1 ¶ 55.

143. Worksheet 803, Bates No. NYC_2_00011826. Plaintiffs note that although this worksheet was sent to the Internal Affairs Bureau ("IAB"), IAB never approved the form. *See* Def. 56.1 ¶ 55; PAF ¶ 37.

144. *See* Def. 56.1 ¶ 57.

145. *Id.* ¶ 58.

146. Pl. 56.1 ¶ 58. *Accord* PAF ¶ 12 (citing Cronin Tr. at 74:2–76:16); *id.* ¶ 40 (citing Cronin Tr. at 185:4–14) (stating that the standards for assessing the adequacy of stop-and-frisk activity log entries are the same for Worksheets 802 and 803).

147. Defendants have urged the Court not to rely upon two reports submitted by plaintiffs—the Report of Professor Jeffrey Fagan and the AG Report, (which also relied on Professor Fagan's analysis)—to find a disputed issue of fact without first resolving defendants' intended *Daubert* challenge to the scientific reliability of Fagan's methods. *See* Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment ("Reply Mem.") at 5 n. 9 (citing *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). However, in their brief, defendants have relied, in part, on the RAND Report, which would be subject to the same testing. The reports all rely on multivariate regression analysis, and none are so obviously flawed as to require exclusion at this point in time. Therefore, without deeming any of the reports to have met the *Daubert* standard, I accept all three for the limited purpose of underscoring that there are disputed issues of fact in this case. If defendants choose to make a *Daubert* motion at a later date, and if I then conclude that the Fagan Report should be rejected as insufficiently reliable, summary judgment may be revisited. However, my strong suspicion is that the Fagan Report would survive a *Daubert* challenge, thus I have no problem considering it as evidence in deciding this motion at this time.

148. *See* Excerpt of RAND Report Summary, Ex. I to Grossman Decl. The RAND Report has also been submitted in its entirety by

Plaintiffs, in turn, have submitted an expert report written by Professor Jeffrey Fagan.[149]

As even the RAND Report acknowledges, the raw statistics suggest enormous racial disparities in the NYPD's stop and frisk practices. Of recorded pedestrian stops in 2006, eighty-nine percent involved people of color—fifty-three percent involved Black individuals, twenty-nine percent Hispanic, eleven percent White, and three percent Asian, with race unknown in four percent of stops.[150] Post-arrest outcomes differed as well, as the 2006 statistics reveal that "[f]orty-five percent of [B]lack and Hispanic suspects were frisked, compared with 29 percent of [W]hite suspects; yet, when frisked, [W]hite suspects were 70 percent likelier than [B]lack suspects to have had a weapon on them."[151]

Despite those raw numbers, defendants have submitted the RAND Report, in part, for its conclusion that "the [racial] disparities are much smaller than the raw statistics would suggest. This does not absolve the NYPD of the need to monitor the issue, but it also implies that a large-scale restructuring of NYPD SQF policies and procedures is unwarranted."[152] Defendants argue that these findings underscore the lack of racially-motivated stops.[153]

The RAND Report utilizes external and internal benchmarking to analyze the NYPD stop and frisk data. RAND notes that "[e]valuating racial disparities in pedestrian stops using external benchmarks is highly sensitive to the choice of benchmark."[154] RAND considers but rejects the arrest benchmark because "arrests may not accurately reflect the types of suspicious activity that officers might observe, arrests can occur far from where the crime occurred, and, since police make both the arrests and the stops, the arrest benchmark is not independent of any biases that officers might have."[155] RAND also considers but rejects the residential census benchmark, noting that "[c]ensus benchmarks do not account for differential rates of crime participation by race or for differential exposure to the police."[156] RAND favors the crime suspect benchmark, which it calls "more promising" than the other two, while acknowledging that "this benchmark also has serious pitfalls."[157]

Using the crime suspect benchmark, RAND found that Black pedestrians were stopped at a rate twenty to thirty percent *lower* than their representation in crime suspect descriptions, while Hispanic pedestrians were stopped at a five to ten percent higher rate than their representation in crime-suspect descriptions.[158] At the other end of the spectrum, using the residen-

plaintiffs, as Ex. 36 to Charney Decl., and is also available at http://www.rand.org/pubs/technical_reports/2007_TR534.pdf.

**149.** *See* Report of Jeffrey Fagan, Ph.D ("Fagan Report"), in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

**150.** *See* RAND Report at xi.

**151.** *Id.*

**152.** Def. 56.1 ¶ 69 (quoting RAND Report at xiv-xv).

**153.** *See* Def. Mem. at 21 n. 25.

**154.** RAND Report at xii.

**155.** *Id.*

**156.** *Id.*

**157.** *Id.* at xi.

**158.** *Id.* at xii.

tial census benchmark revealed that "Black pedestrians were stopped at a rate that is 50 percent greater than their representation in the residential status. The stop rate for Hispanic pedestrians equaled their residential-census representation." [159] Finally, when using the arrest benchmark, "Black pedestrians were stopped at nearly the same rate as their representation among arrestees would suggest. Hispanic suspects appear to be stopped at a rate slightly higher (6 percent) than their representation among arrestees." [160].

The RAND Report also used an internal benchmark methodology "to compare the racial distribution of pedestrians whom individual police officers have stopped with that of pedestrians whom other officers in the same role have stopped at the same times and places." [161] RAND notes that one drawback, among others, is that "if officers in the entire precinct are equally biased, the method will not flag any officers as being problematic." [162]

The Fagan Report critiques the RAND Report and offers alternative statistical analyses of NYPD-supplied figures of SQF activity for 2004 through 2009. Fagan concludes that "the NYPD has engaged in patterns of unconstitutional stops of City residents that are more likely to affect Black and Latino citizens." [163] Fagan concludes further that

> NYPD stop activity is concentrated in precincts with high concentrations of Black and Hispanic residents. The results show consistently, across the most

policy-relevant and frequent crime categories, that racial composition predicts stop patterns after controlling for the influences of crime, social conditions, and the allocation of police resources.[164]

Additionally, Fagan notes that "NYPD stops are significantly more frequent for Black and Hispanic citizens than for White citizens, after adjusting stop rates for the precinct crime rates, the racial composition, and other social and economic factors predictive of police activity." [165] He adds that "Blacks and Latinos are more likely to be stopped than Whites even in areas where there are low crime rates and where residential populations are racially heterogeneous or predominately White." [166]

Fagan concludes that "6.71% of all discretionary stops lack legal justification," and "[a]n additional . . . 24.37% of all discretionary (non-radio run) stops lack sufficiently detailed documentation to assess their legality." [167] Additionally, he states that "[o]fficers rely heavily on two constitutionally problematic stop justifications for nearly half of all stops: furtive movements and proximity to a high crime area." [168] Fagan notes that "[h]igh crime area is cited in more than half the stops as an 'additional circumstance' of the stop, *regardless of the precinct crime rate.*' " [169] He adds, startlingly, that "[a]rrests take place in less than six percent of all stops, a 'hit rate' that is lower than the rates of arrests and seizures in random checkpoints" that have been discussed in similar

159. *Id.*

160. *Id.*

161. *Id.* at 21.

162. *Id.*

163. Fagan Report at 3.

164. *Id.* at 3–4.

165. *Id.* at 4.

166. *Id.*

167. *Id.*

168. *Id.*

169. *Id.* (emphasis added).

lawsuits elsewhere.[170] Also, post-arrest outcomes differ, with Black and Hispanic suspects more likely to be arrested rather than issued summonses, and more likely to be subject to use of force, than Whites.[171]

Fagan critiques multiple aspects of the RAND Report. First, he notes that "RAND relies on the external benchmark of suspect race (as reported by victims) in violent felony crimes to assess racial bias," however, violent crimes are not a useful benchmark since "violent felonies comprise fewer than ten percent of all crime reported in 2005–6, and also are a small fraction of the total number of stops."[172] Additionally, "[a]lmost half of violent crime complaints do not report a suspect race, casting serious doubts on whether statistics based on complaints where suspect race is reported can be generalized to the half of complaints where the suspect race is unknown."[173]

Fagan also notes that RAND's internal benchmark model "relies on a selective and non-representative sample of officers who made 50 or more stops in 2006, a fraction both of the total number of stops made and of the officers who made them."[174] He challenges the reliability of extrapolating from such a small, unrepresentative sample to draw conclusions about the entire universe of stops.[175] As for RAND's acknowledgment that precincts with large numbers of biased stops will lead to no officers being flagged as "outliers," he notes that RAND "assumes low rates of bias and does not allow this assumption to be tested."[176] Finally, Fagan concludes that RAND's approach to analyzing post-stop outcomes is flawed, in that it neglects aspects of the stop such as the suspected crime and the indicia of reasonable suspicion, and concludes that RAND "strongly understates the racial disparities in post-stop outcomes such as frisks and use of force."[177]

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[178] " 'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.' "[179]

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[180] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[181] In turn, to defeat a motion for

---

170. *Id.*

171. *See id.*

172. *Id.* at 5.

173. *Id.*

174. *Id.*

175. *See id.*

176. *Id.*

177. *Id.*

178. Fed.R.Civ.P. 56(a).

179. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir.2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008)).

180. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir.2010).

181. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir.2009).

summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party " 'must do more than simply show that there is some metaphysical doubt as to the material facts,' "[182] and " 'may not rely on conclusory allegations or unsubstantiated speculation.' "[183]

In deciding a motion for summary judgment, a court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' "[184] However, " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' "[185] " 'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.' "[186]

## B. Stops and Frisks

■■■ " '[T]he police can stop and briefly detain a person for investigative pur-

poses if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot,' even if the officer lacks probable cause.' "[187] This form of investigative detention has become known as a *Terry* stop.[188] "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."[189] " 'The officer [making a *Terry* stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.' "[190] "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant."[191]

■■■ It is sometimes the case that a police officer may observe, "a series of acts, each of them perhaps innocent in itself, but which taken together warrant[ ]

**182.** *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**183.** *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010)).

**184.** *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir.2004)).

**185.** *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir.2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) (emphasis removed).

**186.** *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir.2010)).

**187.** *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir.2005) (quoting *United States v.*

*Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). Under New York law, the justifications required for different levels of police intrusion were established in *People v. DeBour*, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976).

**188.** *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**189.** *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581). *Accord Alabama v. White*, 496 U.S. 325, 329–30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (quoting *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)).

**190.** *White*, 496 U.S. at 329, 110 S.Ct. 2412 (quoting *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581).

**191.** *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir.2000).

further investigation." [192] "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." [193] However, "the fact that the stop occurred in a 'high crime area' [may be] among the relevant contextual considerations in a *Terry* analysis." [194] A court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." [195] "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." [196]

## C. Section 1983

Section one of the Civil Rights Act of 1871–known as section 1983—states, in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [197]

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [198] "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." [199]

 Any form of liability under section 1983 requires the defendant's direct involvement in causing the alleged damages. "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must p[rove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [200]

## D. Municipal Liability

 For a person deprived of a constitutional right to have recourse against a municipality under section 1983, he or she must show harm that results from an identified municipal "policy," "custom," or

**192.** *Terry*, 392 U.S. at 22, 88 S.Ct. 1868.

**193.** *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (citing *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)).

**194.** *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

**195.** *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quotation marks and citation omitted).

**196.** *United States v. Lee*, 916 F.2d 814, 819 (2d Cir.1990).

**197.** 42 U.S.C. § 1983.

**198.** *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). *Accord Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (" '[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything.' " (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979))).

**199.** *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992).

**200.** *Ashcroft v. Iqbal*, 556 U.S. 662, ——, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (internal citations omitted).

"practice."[201] In other words, a municipality may not be found liable simply because one of its employees or agents is guilty of some wrongdoing.[202] Moreover, a policy, custom, or practice cannot arise from a single instance of unconstitutional conduct by an employee of the municipality.[203]

■ Because vicarious liability is inconsistent with section 1983's causation requirement,[204] "the 'official policy' requirement was intended to distinguish acts of the municipality from acts of municipal employees, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible."[205] The Supreme Court has emphasized that:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.[206]

In the absence of an established written policy of the municipality, a plaintiff must prove that the discriminatory practices of municipal officials are so "permanent and well settled as to constitute a 'custom or usage' with the force of law,"[207] or that a practice or custom of subordinate employees was "so manifest as to imply the constructive acquiescence of senior policy-making officials."[208]

■ "A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'"[209] The Second Circuit has set forth "three requirements that must be met before a municipality's failure to train

**201.** *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Accord Board of County Comm'rs v. Brown*, 520 U.S. 397, 402, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

**202.** *See Brown*, 520 U.S. at 405, 117 S.Ct. 1382.

**203.** *See Tuttle*, 471 U.S. at 831, 105 S.Ct. 2427 (Brennan, J., concurring in part and concurring in the judgment) (stating that "[t]o infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*.").

**204.** *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

**205.** *Pembaur*, 475 U.S. at 479, 106 S.Ct. 1292. *Accord Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir.2003) (explaining that plaintiff must show that municipality is actually responsible for her injury).

**206.** *Brown*, 520 U.S. at 404, 117 S.Ct. 1382 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). *Accord City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir.2007).

**207.** *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir.1992). *Accord Green v. City of N.Y.*, 465 F.3d 65, 80 (2d Cir.2006) (quoting *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)).

**208.** *Sorlucco*, 971 F.2d at 871. *Accord Green*, 465 F.3d at 80.

**209.** *Patterson*, 375 F.3d at 226 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996)).

or supervise constitutes deliberate indifference to the constitutional rights of citizens."[210] *First*, "the plaintiff must ... allege that 'a policy-maker knows to a moral certainty that her employees will confront a given situation.'"[211] *Second*, the situation must "either present[ ] the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."[212] *Third*, mishandling of the situation must "frequently cause the deprivation of a citizen's constitutional rights."[213]

A duty to train arises so that subordinates entrusted with the discretionary exercise of municipal power can distinguish between lawful and unlawful choices. Because the exercise of such discretion can arise in myriad circumstances, the "nuance" of a particular training need may only become apparent to municipal policy makers after a pattern of violations arises in substantially similar circumstances.[214]

■■■ There is "a heavy burden of proof" to show that the municipality's "response was so patently inadequate to the task as to amount to deliberate indifference ... Such inadequacy must reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction."[215]

## E. Qualified Immunity

■■■ Government officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[216] "When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'"[217] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[218] "The objective reasonableness test is met ... if the question of whether the officers would be violating rights is one on which 'officers of reasonable competence could dis-

---

**210.** *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir.1992). *Accord Reynolds*, 506 F.3d at 192; *Green*, 465 F.3d at 80.

**211.** *Green*, 465 F.3d at 80–81 (quoting *Walker*, 974 F.2d at 297) (internal quotation marks omitted).

**212.** *Id.*

**213.** *Id.*

**214.** *Cash v. County of Erie*, 654 F.3d 324, 336 (2d Cir.2011) (quoting *Connick v. Thompson*, — U.S. —, 131 S.Ct. 1350, 1363, 179 L.Ed.2d 417 (2011)).

**215.** *Reynolds*, 506 F.3d at 192–93.

**216.** *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir.2010) (quoting *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir.2007)).

**217.** *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Under *Pearson*, courts need not proceed through the two-step inquiry in a particular order, as was required under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), however, "the traditional sequence is 'often appropriate.'" *Id.* at n. 2 (quoting *Pearson*, 555 U.S. at 236, 129 S.Ct. 808).

**218.** *Okin v. Village of Cornwall–on–Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir.2009) (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151).

agree.' " [219] "If . . . no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." [220] "[T]he 'objectively reasonable' inquiry *is part of* the 'clearly established' inquiry." [221] "[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." [222]

## IV. DISCUSSION

### A. The February 2008 Incident Alleged by Floyd

#### 1. Fourth Amendment Claim

 Summary judgment is granted to defendants as to Floyd's Fourth Amendment claim based on the February 2008 incident. The officers testified that their reasons for suspecting Floyd of possible criminality were that there was a recent midday burglary pattern in the neighborhood of the stop, and that Floyd and his neighbor made "furtive movements" [223]—to wit, that they were "jostling," "fumbling with," or "playing with" the doorknob or lock of the front door to the basement apartment and Floyd was "nervously looking back toward the street," or "looking back toward the street and then focused back on the door, as if he was looking to see if anyone was looking at them." [224]

Two of the officers also mentioned noticing that one of the men held a large key ring, which further supported their suspicion that a burglary was in progress. [225]

The existence of a midday burglary pattern is undisputed. All three officers testified that they were aware of such a pattern. Plaintiffs have not submitted evidence to contradict the assertion that there was a burglary pattern and that the officers were aware of the pattern.

Furthermore, while Officer Joyce did not check the box for "Area Has High Incidence Of Reported Offense Of Type Under Investigation" as a reason for the stop on the UF250 form that he completed, he did check the boxes corresponding to "Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity," and "Ongoing Investigations, e.g., Robbery Pattern." [226] All three of these boxes reasonably could correspond to the officers' belief that there was a midday burglary pattern. Despite the UF250 form's instruction to "Check All That Apply," the fact that Officer Joyce checked two out of the three boxes that could apply to the same factor—investigation of a burglary pattern at that time of day—does not create a material disputed fact. However, a burglary pattern, without more, is an insufficient basis for reasonable suspi-

**219.** *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

**220.** *Id.* (citation omitted).

**221.** *Id.* at n. 11 (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151) (emphasis added). *But see Taravella*, 599 F.3d at 134–35 (considering objective reasonableness as a "third question") and *id.* at 136–41 (Straub, J., dissenting) (recognizing that Second Circuit precedent has inconsistently "described qualified immunity analysis both as a two-step *and* as a three-part process," despite the Supreme

Court's clear articulation in *Saucier* and *Pearson* of a two-step analysis).

**222.** *Husain v. Springer*, 494 F.3d 108, 133 (2d Cir.2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999)).

**223.** Joyce UF250.

**224.** Def. 56.1 ¶¶ 457, 461, 463. *See also* Pl. 56.1 ¶¶ 457, 461, 463.

**225.** *See* Hernandez Tr. at 145:21–25; Kelly Tr. at 44:3–10.

**226.** *See* Joyce UF250.

cion.[227] Thus, I now consider the other purported support for reasonable suspicion—the allegedly "furtive movements."[228]

*First,* whether Floyd and his neighbor were "nervously looking back" toward the street is a disputed fact, as Floyd testified that he had his back to the officers and did not notice them until "at least two of the officers had already come inside the gate of the building and were on my sort of right side periphery."[229] Construing the facts in the light most favorable to plaintiffs, whether Floyd was looking back, whether he was *doing* so nervously, and whether he appeared to be looking to see if he was being watched in a manner that should have allowed him to see the officers approach, are material disputed facts.

*Second,* it is undisputed that Floyd and his neighbor were attempting to open the door. Floyd describes trying several different keys in the lock, while the officers describe the men as "jostling," "fumbling with," or "playing with" the lock. Floyd's description of his activity does not contradict the officers' description of his physical movements. Jostling a lock is an activity consistent with the criminal activity of attempting to break into a house, and consistent with the innocent activity of trying to open a door that you are authorized to open when you are unsure which is the correct key. Of course, that "conduct justifying [a] stop [is] ambiguous and susceptible of an innocent explanation" does not render a stop unconstitutional.[230] As the Supreme Court has stated, "*Terry* recog-

nized that [ ] officers could detain the individuals to resolve the ambiguity."[231] It is undisputed, then, that Floyd was manipulating the lock, which, while actually innocent, could have reasonably been viewed by police officers as involving possible criminality.

*Finally,* two of the officers testified that either Floyd or his neighbor appeared to be holding a large key ring, with as many as fifty keys. The officers explained that this gave them further reason to suspect that they were witnessing a burglary in progress. However, Floyd has testified that there were only seven to ten keys. Thus, while it is undisputed that either Floyd or his neighbor were holding some number of keys, and undisputed that the officers observed the men attempting to open the door with keys as they approached, whether the men had ten keys or fifty keys is a disputed fact, the resolution of which requires a credibility determination.

Without resolving any of the disputed facts, I find that the officers were justified in their reasonable suspicion. Plaintiffs assert that "[t]he only undisputed material facts are that three officers observed, for no more than one minute, two Black men trying to unlock the front door of a house in the middle of the afternoon using keys."[232] To that description, I must add the undisputed fact that the officers were aware of a midday burglary pattern in the neighborhood. Those factors in combination—even without the disputed facts of

227. *See Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

228. Joyce UF250.

229. 4/30/09 Deposition of David Floyd, Ex. 21 to Charney Decl., at 184:5–8. *Accord* Def. 56.1 ¶ 444; Pl. 56.1 ¶ 444.

230. *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673.

231. *Id.*

232. Opp. Mem. at 4.

whether the men were nervously looking back and whether they had ten keys or fifty—create enough reasonable suspicion to justify the officers briefly detaining the men for an investigatory stop. In addition, because the officers suspected that Floyd and his neighbor were committing the violent crime of burglary, they were justified in frisking the two men to ensure the officers' own safety.

 On the other hand, Floyd alleges that the officers searched his pockets after they frisked him. There is no allegation that the officers felt anything during the frisk that resembled a weapon or contraband that would have given rise to probable cause to perform a search.[233] Joyce indicated in the UF250 that no search was performed. There is a material disputed fact as to whether a search was performed, and if it was, whether it was an unconstitutional search. Thus, I grant summary judgment to defendants on Floyd's Fourth Amendment claim, except as regards the allegedly unconstitutional search. While the instant suit is primarily concerned with stops and frisks, Floyd may nonetheless continue to pursue his section 1983 claim predicated on the Fourth Amendment violation of searching his pockets without probable cause.

Defendants are not entitled to qualified immunity on this claim. There are material facts in dispute that would have an impact on an assessment of the reasonableness of the officers' actions.

[A] defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.[234]

In this case, a reasonable jury could find that it was objectively unreasonable for the officers to search Floyd, based on clear Fourth Amendment jurisprudence requiring that searches be based on probable cause.

### 2. Equal Protection Claim

Summary judgment is likewise granted to defendants on Floyd's Equal Protection claim based on the February 2008 incident. Because I have found that the officers had reasonable suspicion to stop Floyd, I do not find that the officers impermissibly used race as the determinative factor in deciding to stop him.[235]

### B. The June 2008 Incident Alleged by Ourlicht

#### 1. Fourth Amendment Claim

 Summary judgment is denied to defendants as to Ourlicht's Fourth Amendment claim based on the June 2008 incident. Defendants appear to argue that no individualized suspicion was necessary because "it was clear that the individuals who were involved in the alleged incident had an emergency concerning a report of a gun in Ourlicht's vicinity and that they were securing the area and the nearby building to ensure that no one had a gun or would get hurt." [236] However, there is no evidence that the police officers were, in fact,

---

**233.** *See Minnesota v. Dickerson,* 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

**234.** *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999).

**235.** I do not dismiss Floyd's *Monell* claims at this time because he alleges a separate unconstitutional stop and frisk which was not challenged by defendants in this motion.

**236.** Def. Mem. at 6.

responding to a report of a gun. Even if they were, such a general report does not support reasonable suspicion to stop and frisk any individual in the area.[237] The Fourth Amendment requires that officers must have reasonable *individualized* articulable suspicion that an individual is armed and dangerous before frisking him.[238]

Defendants contest whether the individuals who stopped Ourlicht were actually from the NYPD. This is a disputed issue of fact to be resolved by a fact-finder. Defendants claim that summary judgment must be granted because Ourlicht "cannot establish by a preponderance of the evidence" that the individuals were NYPD officers. Specifically, they note that an NYPD van numbered 9466 is assigned to PSA 5, the command in which the incident took place, but that NYPD documents show that the van was not at the alleged location at the alleged time on the alleged dates; the activity logs of the four officers assigned to the van reveal that none of them were there; the assigned officers were not all males, while Ourlicht alleges the presence of only male officers; and Ourlicht affirmatively stated that he did not recognize any of the officers assigned to the van at the photo array procedure that was conducted on August 24, 2009.[239] Defendants argue further that Ourlicht only indicated eleven officers who he thought *might* have been involved in the incident, but that only one of those officers was assigned to PSA 5 at the time of the alleged incident and on duty; that individual was not at the location of the incident on June 6, 2008; and that individual was the desk sergeant in the station house on June 9, 2008.[240]

While defendants argue from these factors that Ourlicht is "incapable of meeting his burden of proof by a preponderance of the evidence that members of the NYPD were involved in the incident,"[241] in fact, defendants' arguments merely underscore that there is a triable issue of fact as to whether Ourlicht was stopped by NYPD officers. The fact is that Ourlicht gave a van number that *is* assigned to the command in which the incident took place.[242] Two officers who were assigned to the van indicated in their memo books that they were near the location of the stop around the time of the stop.[243] Ourlicht identified other NYPD officers whose whereabouts at the time of the stops is somewhat ambiguous in this record.[244] In sum, as plaintiffs underscore, "[a] reasonable jury could conclude from Ourlicht's identification of NYPD uniforms and van that the NYPD conducted his stop, whether or not he identified an officer."[245] Ultimately, resolution of this issue will turn on a credibility determination, which is beyond the pur-

**237.** *See Ybarra v. Illinois,* 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked."); *United States v. Jaramillo,* 25 F.3d 1146, 1152 (2d Cir.1994) ("a [*Terry*-type] patdown is not permissible with respect to a person in a public place where the officers have no specific and articulable facts on which to base a suspicion of that person in particular").

**238.** *See Jaramillo,* 25 F.3d at 1551–52.

**239.** *See* Def. Mem. at 7.

**240.** *See id.* at 8 (citing Def. 56.1 ¶¶ 504–507).

**241.** *Id.* at 9.

**242.** *See* PAF ¶ 312 (citing Def. 56.1 ¶¶ 510–511).

**243.** *See* Opp. Mem. at 8 (citing Ourlicht Tr., at 155:21–156:7; PAF ¶¶ 321, 323–325; Map, Ex. 177 to Charney Decl.; Pl. 56.1 ¶ 506).

**244.** *See id.* (citing PAF ¶¶ 319, 321, 324, 325).

**245.** *Id.* at 9.

view of a court deciding a summary judgment motion.

Defendants are not entitled to qualified immunity on Ourlicht's Fourth Amendment claim. There are material facts in dispute that would affect an assessment of the reasonableness of the officers' actions. A reasonable jury could find that it was objectively unreasonable for the officers to act as they did, given the clear contours of the law governing stops and frisks in New York under *Terry* and *DeBour*, and the clear legal dictate that the police must have individualized reasonable suspicion before stopping and frisking a person. Additionally, it is undisputed that the officers searched Ourlicht without probable cause. Therefore, summary judgment is denied to defendants as to Ourlicht's Fourth Amendment claim.

### 2. Equal Protection Claim

■ Summary judgment is likewise denied to defendants on Ourlicht's Equal Protection claim. Because a reasonable jury could find that Ourlicht's stop was unconstitutional, and that the stop occurred in the context of citywide racial disparities in stop-and-frisk patterns unexplainable by chance, crime patterns, or officer deployment patterns, there is a triable issue of fact as to whether Ourlicht's stop was racially motivated.

### C. Plaintiffs' *Monell* Claims Against the City

#### 1. Fourth Amendment Claims

#### a. Widespread Custom or Practice of Suspicionless Stops

■ The City does not have a written policy requiring or permitting stops and frisks of persons without reasonable suspicion, nor do plaintiffs allege that it does. The question is whether municipal officials have a widespread custom or practice of unconstitutional stops and frisks that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law,"[246] or whether a custom or practice of subordinate employees is "so manifest as to imply the constructive acquiescence of senior policy-making officials."[247] Plaintiffs focus their argument primarily on the latter standard. Construing the facts in the light most favorable to plaintiffs, I conclude that there are disputed issues of fact as to whether or not the City has acquiesced in a widespread custom or practice of unconstitutional stops and frisks.

The parties first dispute whether, in fact, there is a widespread practice of unconstitutional stops and frisks. For the purposes of deciding this motion, I accept the Fagan Report's conclusion that 24.37 percent of recorded stops and frisks during the period 2004 through 2009 "lack sufficiently detailed documentation to assess their legality," while 6 percent of stops "lack legal justification."[248] Defendants argue that the Fagan Report does not raise an issue of material fact regarding a widespread custom because "Fagan actually concludes that close to 70 percent of the stops for 2004–2009 are facially constitutional."[249] However, I find that the questionable constitutionality of 30 percent of stops is sufficient to allege that the custom is widespread. Defendants also attack the 6 percent figure by arguing that

---

246. *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142(1970)).

247. *Green,* 465 F.3d at 80 (quoting *Sorlucco,* 971 F.2d at 871).

248. Fagan Report at 4.

249. Reply Mem. at 5.

Fagan's conclusion is based only on the fact that those UF250s "do not have any circumstances which led to the stop checked off, even though they may have had other circumstances which led to the stop marked elsewhere on the form," which they argue is merely "a matter of incomplete paperwork." [250]

However, it is more than incomplete paperwork. *First,* defendants oversimplify Fagan's analysis. In fact, Fagan closely examined the data from the UF250s, classifying each into one of five different categories—including two categories of "justified" stops, one category of "unjustified" stops, and two categories of "indeterminate" stops. [251] *Second,* as Fagan states, "[t]he fact that the legal sufficiency of 31 percent of all stops cannot be shown suggests that the current regime for regulating the constitutional sufficiency of the huge volume of stops is ineffective and insensitive to the actual conduct of stops." [252] I agree. Defendants cannot argue that the NYPD has sufficient monitoring in place because officers are required to complete UF250s and because QAD audits the completeness of such forms—which I address further below—but then downplay the fact that over 30 percent of all discretionary stops are not documented sufficiently to conclude whether or not they were constitutionally justified. [253] It is possible that there are certain flaws in Fagan's analysis. [254] Nonetheless, in general, Fagan—who is or has been

---

**250.** Reply Mem. at 5.

**251.** Fagan explains, "1. Stops are **justified** if the circumstances provided are considered sufficient as the sole rationale for the stop and need no additional information or qualification (i.e., Casing, Drug Transactions, or Violent Crime)[.] 2. Stops are **justified** if the circumstances listed are conditionally justified (e.g., carrying a suspicious object, fitting a suspect description, acting as a lookout, wearing clothing indicative of a violent crime, furtive movements, or a suspicious bulge in one's clothing), and an 'additional circumstance' is also indicated. 3. Stops are **unjustified** if no *primary* stop circumstances are provided. For example, stops are **unjustified** if the only listed circumstances is that the suspect was present in a high crime area. Stops that list 'Other Stop Factors' only are unjustified. 4. Stops are of **indeterminate** legality if the circumstance or circumstances listed are (all) conditionally justified, and no additional circumstances are provided. 5. Stops are of **indeterminate** legality if the only circumstances listed are 'other circumstances' or if no additional circumstances are indicated." Fagan Report at 50 (emphasis in original).

**252.** *Id.* at 55.

**253.** The City, through the Dennis Report, also apparently suggests that the 24.37% of stops of indeterminate constitutionality should either be discarded or redistributed. However, as Fagan makes clear in his Supplemental Report, such a move would be inappropriate because of the "very serious selection bias that such a move would introduce." Supp. Fagan Report at 37. Among other reasons, Fagan notes that stops are more likely to be indeterminate if they occurred in precincts with higher Black populations; stops of Black suspects are 5% more likely to be classified as indeterminate than stops of Whites; stops for violent crimes and for drug crimes are less likely to be indeterminate; stops for weapons, trespass, and other crimes are more likely to be indeterminate than for property crimes; and stops of younger suspects are more likely to be indeterminate. *See id.*

**254.** For example, Fagan notes that 55.4 percent of stops were based *in whole or in part* on "high crime area" and 42.3 percent on "furtive movements," neither of which standing alone is sufficient for reasonable suspicion, but which in combination could support reasonable suspicion, as in the case of Floyd's February 2008 stop. Fagan does not specify what percentage of stops were based *in whole* on "high crime area" or on "furtive movements," and what percentage were based on those factors in addition to other factors. *See* Reply Mem. at 6 n. 11. Fagan also criticizes the "hit rate"—that is, "the percentage of stops that result in arrests of the persons stopped"—of 2004–2009 stops as being lower

affiliated with Columbia Law School, Columbia University, Yale Law School, and New York University Law School, among others—has presented careful, considered analysis of the NYPD-supplied data, using multivariate regressions.[255] He has provided sound statistical support for plaintiffs' allegations, certainly sufficiently reliable to put defendants' contentions in enough dispute to defeat this motion for summary judgment.[256] Thus, I find that plaintiffs have demonstrated that there is a disputed issue of fact as to whether the NYPD has engaged in a widespread practice of suspicionless stops and frisks. I find further that there is a disputed issue of fact as to whether this practice was "so manifest as to imply the constructive acquiescence of senior policy-making officials," [257] giving rise to potential municipal liability.

### b. Widespread Custom or Practice of Imposing Quotas on Officer Activity

■ In addition to alleging a widespread practice or custom of suspicionless stops, plaintiffs separately allege that NYPD supervisors have a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers, and that high-level policymakers have been aware of the quotas and have sometimes even encouraged their use "by pressuring borough and precinct commanders to increase enforcement activity numbers." [258] Defendants argue that plaintiffs have failed to show that there are *stop and frisk* quotas; that they have failed to establish that any such quotas have caused the alleged constitutional injuries; and that plaintiffs' evidence of "pressure" begins

---

than the hit rate of a random vehicle checkpoint. While this presents some cause for concern, it is not clear whether there is some "correct" hit rate that is significantly different. Stops and arrests are made pursuant to different legal standards, such that when a stop made pursuant to reasonable suspicion does not ultimately result in an arrest made pursuant to probable cause, it cannot be said on that basis alone that the arresting officers lacked reasonable suspicion to make the stop. *See* Fagan Report at 4; Opp. Mem. at 11; Reply Mem. at 6 n. 11

255. The Supreme Court has accepted multivariate regressions as a reliable statistical methodology to prove racial discrimination in civil rights cases. *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 398–404, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 306–13, 97 S.Ct. 2736, 53 L.Ed.2d 768; *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 337–340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

256. In his Supplemental Report, Fagan makes several additional interesting and troubling observations that call into question the reliability of the data on the UF250s. *First*, he notes that "[o]ver time, officers identify

progressively more circumstances to justify their stops," which he attributes to "decreasing sensitivity or attention to matching the realities of stops to the categories available to check them off." Supp. Fagan Report at 39. *Second*, he observes that "officers seem to be increasingly less likely to indicate a valid crime whose suspicion generates the stop"— by not indicating any crime or indicating merely that it was a felony or misdemeanor, or a string of text that does not correspond to a penal law violation. *Id*. Third, he states that "[t]he use of several of the more subjective Stop Circumstances or Additional Circumstances has grown over time," which Fagan argues indicates the possibility that a "narrative or script of suspicion" has developed. *Id*. at 41 (emphasis omitted). Fagan also highlights that, by the City's own admission, a large proportion of SQF activity is conducted in Operation Impact zones by officers who are, by and large, rookies recently out of the Academy with limited experience on the streets, and with limited opportunity to be paired with more experienced officers. *See id*. at 48.

257. *Green*, 465 F.3d at 80 (quoting *Sorlucco*, 971 F.2d at 871).

258. Opp. Mem. at 13.

after the most recent incident alleged in the Complaint.[259]

*First,* plaintiffs have submitted some evidence of specific numerical expectations for stops and frisks, as well as general pressure to increase the amount of stop and frisk activity.[260] *Second,* defendants treat stop and frisk activity as if it is conceptually distinct from summons and arrest activity, when in fact it is not. A stop and frisk is often a predicate to an arrest or the issuance of a summons, and pressure to increase enforcement activity more generally could be expected to have an impact on any of these three actions. Accordingly, I find evidence of pressure or quotas to increase summons and arrest activity to be relevant to plaintiffs' claims.

Defendants have presented the testimony of numerous officers who deny ever hearing about quotas, and of supervisors who deny ever imposing quotas. However, plaintiffs have presented the testimony of other officers who have been instructed to meet certain quotas and have been punished to one degree or another for not meeting those quotas. Even more significantly, plaintiffs have submitted audio recordings of roll call meetings during which such instructions regarding stops and frisks, as well as summons and arrest activity, have been given. In addition, it is noteworthy that in 2006, a labor arbitrator found that such quotas had been imposed in one precinct. As plaintiffs suggest, the outcome of that labor arbitration proceeding put the NYPD leadership on notice as to the existence of quotas, at least in one precinct, and at least since 2006.[261]

Proof that such quotas and/or pressure have caused the pattern of suspicionless stops will necessarily consist largely of circumstantial evidence. Plaintiffs have presented the smoking gun of the roll call recordings, which, considered together with the statistical evidence, is sufficient circumstantial evidence for this claim to survive summary judgment. Even if plaintiffs' evidence of quotas or pressure post-dates the last stop alleged in the Complaint, plaintiffs allege an ongoing pattern that includes, but is not limited to, the specifically alleged incidents. Thus, I find defendants' argument in this respect to be unavailing. In sum, I find that there is a triable issue of fact as to whether NYPD supervisors have a custom or practice of imposing quotas on officer activity, and whether such quotas can be said to be the "moving force" behind widespread suspicionless stops.[262] Therefore, I deny defendants' motion for summary judgment on plaintiffs' Fourth Amendment claims against the City.

## 2. Equal Protection Claims

The precise nature of plaintiffs' Equal Protection argument is difficult to discern. Plaintiffs argue that their Equal Protection claim is predicated on an express racial classification—that race is the "determinative factor" in the decision to effect a stop [263]—while elsewhere they use the language of discriminatory purpose and dis-

---

259. *See* Reply Mem. at 17–18.

260. *See* PAF ¶¶ 55, 57, 62, 79 (citing, *inter alia,* the testimony of Inspector Montgomery that he expected every officer in his precinct to average at least 2.3 UF250s per month, and that a failure to do so could count as a failure on performance examinations; and the testimony of Officer Polanco that his supervisor repeatedly told officers that "they were each required to record 5 stop-and-frisks per month and that if they failed to meet this requirement, they could be re-assigned to a different command or receive low quarterly performance evaluations").

261. *See* Opp. Mem. at 12 (citing PAF ¶ 84).

262. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

263. *See* Opp. Mem. at 6, 13.

parate impact.[264] I am not persuaded by plaintiffs' argument that the City employs an express racial classification. In fact, plaintiffs do not assert that the City has an *express policy* that people of color are to be stopped at a greater rate, and they explicitly deny taking the position that "the City has a policy or custom of stopping and frisking Hispanics and Blacks 'based *exclusively* on their race[.]' "[265] Yet plaintiffs cite no cases to suggest that a court may find an express racial classification absent some evidence of an articulated policy of treating individuals of different races differently, or evidence that individuals have been stopped *exclusively* based on their race.[266] Indeed, plaintiffs' brief focuses primarily on their claims of discriminatory purpose and disparate impact.

### a. Widespread Pattern and Practice of Race–Based Stops

■■■ There are disputed issues of fact regarding whether the City has a widespread pattern and practice of effecting stops and frisks in which the "determinative factor" is race rather than reasonable suspicion. Defendants have indicated their intention to challenge the scientific reliability of the Fagan Report and there-

fore dispute that report's findings of disparities in the rates at which African–American and Latino individuals are stopped vis-a-vis Whites.[267] However, unless I were to strike the entire report on *Daubert* grounds, which I am not inclined to do at this stage, defendants' position simply underscores the existence of a factual dispute, which a jury will have to decide.

Fagan not only has provided his own statistical analyses of the NYPD-supplied data on stops and frisks over a five-year period, but also has provided careful critiques of the RAND Report, both its methodologies and its presentation. Fagan alleges that the RAND Report both underreports racial disparities in stops and post-stop outcomes, and downplays its results when they do reveal racial disparity.[268] He has also ably responded to the City's critiques of his own report, providing justification for the methodological choices he made and the critiques he made of the RAND Report.[269]

Defendants argue that

[t]o the extent plaintiffs claim deprivation of their equal protection rights

264. *See id.* at 14–19.

265. *Id.* at 13 (quoting Def. Mem. at 19) (emphasis in original).

266. *See, e.g., Brown v. City of Oneonta,* 221 F.3d 329 (2d Cir.2000) (finding that plaintiffs "were not questioned solely on the basis of their race[,]" and accordingly "have not identified any law or policy that contains an express racial classification").

267. *See* Def. Mem. at 5 n. 9.

268. *See, e.g.,* Fagan Report at 101 ("The RAND study's discussion repeatedly de-emphasizes the effect of its own finding. For example, Table 5.2 shows that overall blacks and whites have statistically significant differences for every outcome variable considered. Instead of highlighting this important fact along with the other results it discusses, the

chapter focuses on white-nonwhite comparisons, which produce more muted differences (note that nonwhites include Hispanics, Asians, and others) than the stark black-white results."); *id.* ("[I]n many places, the study understates the magnitude of racial differences by conflating percentages and percentage points. For example, the Report observes, while referring to Table 5.2, that 'stopped nonwhites have a frisk rate that is about 3 to 4 percent higher than for white pedestrians.' It should have stated that the nonwhite-white frisk rate difference is 3 to 4 percentage points, which at the reported magnitudes represents a 10 to 12 [percent] higher rate of being frisked for nonwhites, or roughly three times as great as the study claimed.").

269. *See generally* Supp. Fagan Report.

based on the NYPD's deployment of officers to predominantly African–American and/or Latino neighborhoods, it is clear that defendants have a legitimate law enforcement purpose for deployments and that plaintiffs cannot prove any discriminatory motive by the City in making such deployments.[270]

However, plaintiffs insist that they "are not challenging the deployment of NYPD resources to minority neighborhoods, but rather NYPD officers' stop-and-frisk activities once they get there."[271] Plaintiffs allege that the

> NYPD has purposefully engaged in a widespread pattern and practice of concentrating its stop and frisk activity on Black and Hispanic neighborhoods *based on their racial composition rather than legitimate non-racial factors,* with the result that Blacks and Hispanics are unconstitutionally burdened by illegal stops on the basis of their race.[272]

Plaintiffs' argument is clarified by reference to the Fagan Report, which concludes, "[t]he results show consistently, across the most policy-relevant and frequent crime categories, that racial composition predicts stop patterns *over and above any predictions made by crime or other factors.*"[273] In other words, while certainly the NYPD can, does, and should deploy greater numbers of officers to high crime areas, after controlling for crime rate and similar factors, the statistics still show that African–Americans and Latinos are stopped at higher rates than Whites.[274] This statistical evidence gives rise to a disputed material fact as to whether the NYPD's stop and frisk policies have had a disparate impact in the form of a widespread pattern of race-based stops.

### b. Discriminatory Purpose

Plaintiffs rely primarily on the statistical evidence of racial disparity in the Fagan Report not only as evidence of disparate impact but also as evidence of discriminatory purpose. Plaintiffs argue that "[w]here, as here, statistical evidence shows an especially stark racial disparity, such evidence may be sufficient by itself to establish a prima facie case of intentional race discrimination."[275] In addition to the statistical evidence, plaintiffs point to other evidence of discriminatory purpose. They argue that the NYPD's awareness of the long-standing racial disparities—particularly as a result of the 1999 AG Report and the 2007 RAND study—and failure to take sufficient corrective action is probative of

---

**270.** Reply Mem. at 21–22.

**271.** Opp. Mem. at 14.

**272.** *Id.* (emphasis added).

**273.** Fagan Report at 39 (emphasis added). Fagan continues, "In effect, overall stop patterns in the precincts are predicted more by the Percent Black and Percent Hispanic (compared to Percent White) than by observed crime. These results are robust to a set of alternate controls and alternate set of conditions and contexts. The durability of the results across both crime types in the baseline models and across variations in [ ] suggests that in fact, the racial composition of an area plays an important role in conduct of stops that exceeds the role of crime, social

conditions, *or the allocation of police resources." Id.* (emphasis added).

**274.** Putting aside the officer deployment issue, Fagan also concludes that "Blacks and Latinos are more likely to be stopped than Whites even in areas where there are low crime rates and where residential populations are racially heterogeneous or predominantly White." Fagan Report at 4.

**275.** Opp. Mem. at 16 (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Castaneda v. Partida,* 430 U.S. 482, 495 n. 13, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Santiago v. Miles,* 774 F.Supp. 775, 798 (W.D.N.Y.1991)).

discriminatory purpose.[276] Plaintiffs also assert that defendants' failure to fully comply with the terms of the *Daniels* settlement is evidence of their discriminatory purpose.[277] In addition, they argue that the City's failure to fully implement its own Racial Profiling Policy—which was developed as part of the *Daniels* settlement—is evidence of its discriminatory purpose. Plaintiffs also assert that the City has "refused" to adopt two of the RAND Report's recommendations, further evidencing its discriminatory purpose.[278]

In addition to contesting the statistical evidence of disparate impact, defendants argue that "plaintiffs cannot ... establish, as they must, any discriminatory purpose by a City decisionmaker against either [African–Americans and/or Latinos] or that the City's deployment policy was the proximate cause of their alleged injuries."[279] Defendants maintain that only when the statistical evidence points to disparities as extreme as those in *Yick Wo v. Hopkins*[280] in which all Chinese individuals were denied permits and all but one non-Chinese individual was given a permit—or *Gomillion v. Lightfoot*[281]—in which a city redis-

tricted to exclude 395 to 396 of the 400 black voters while not excluding a single white voter—can statistical evidence be proof of discriminatory intent.[282]

In addition, defendants aver that they have fully implemented the terms of the *Daniels* settlement;[283] that they have fully implemented their Racial Profiling Policy;[284] and that they have adopted many of the suggestions in the RAND Report, even though "[p]laintiffs cite no legal authority for the proposition that NYPD had a legal obligation to follow any or all of RAND's recommendations (none of which were premised on any need to cure unconstitutional conduct)[.]"[285] As in other areas in dispute, plaintiffs' contention is that to the extent that defendants have instituted changes, they have failed to implement the changes effectively and comprehensively.[286]

For an Equal Protection claim, discriminatory purpose may be proven through statistics alone. The statistical evidence in the instant case, while strong enough to show a disparate impact, is likely not strong enough to show discriminatory purpose standing alone. However, plaintiffs

---

276. *See* Opp. Mem. at 17 (citing PAF ¶¶ 112, 118–120, 128–130).

277. *See id.* (citing *Daniels* Settlement at ¶¶ C.5 and D.1.b; Pl. 56.1 ¶¶ 26, 29, 31, 38; PAF ¶¶ 29–30).

278. *Id.* at 17–18.

279. *See* Def. Mem. at 22.

280. 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

281. 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

282. *See* Def. Mem. at 24.

283. *See* Reply Mem. at 9 (citing Def. 56.1 ¶¶ 2–28).

284. *See id.* at 9, 10 (citing Def. 56.1 ¶¶ 195–231, 237, 240–245, 300–303; Reply Declara-

tion of Heidi Grossman ("Reply Decl."), Defendants' Counsel, ¶¶ 26–27; Testimony of Agron, Dang, Eddy, Hegney, Marino, Mulligan, Ortiz, and Palmieri, Ex. X to Reply Decl.).

285. *Id.* at 9. Defendants also state that they were unable to identify or discipline the fifteen officers that RAND indicated overstopped African–Americans and Latinos, but that they purchased the Rand-recommended internal benchmarking software, which they ran against 2007 data and which revealed only understoppers of minorities. *See id.* (citing RAND Report at 26 n. 1, 45 C.F.R. §§ 46.101–46.124).

286. *See* Opp. Mem. at 18 (contesting effectiveness of command self-inspections and audits mandated by the Racial Profiling Policy).

have presented other proof in addition to the statistical evidence-namely, the inadequacy of the City's efforts to take remedial steps to reduce the racial disparity of stops, as detailed above and further below.

Viewing the evidence in the light most favorable to plaintiffs, and in view of the repeated notice of disparate impact and competing contentions over how complete the City's efforts to implement change have been, I cannot say that the City's purported corrective actions have been sufficient to negate the inference that intentional discrimination was the City's "standard operating procedure." [287] I therefore deny defendants' summary judgment motion on plaintiffs' Equal Protection claims against the City.

### 3. Fourth and Fourteenth Amendment Failure to Train, Supervise, Monitor, and Discipline

 Plaintiffs have alleged that defendants demonstrated deliberate indifference to the likelihood that NYPD officers would commit constitutional violations, through their failure to train, supervise, monitor, and discipline adequately. Such failures, plaintiffs argue, have caused the patterns of widespread Fourth Amendment violations and widespread Fourteenth Amendment violations.

Defendants maintain that the City has a comprehensive practice of oversight of the constitutionality of stops throughout the chain of command.[288] Defendants argue that even if there was a widespread practice of suspicionless stops, plaintiffs cannot establish that the City has been deliberately indifferent to the constitutional depriva-

tions, because it "has in place a training, monitoring, supervision and discipline system to address any departures from its stated policy regarding stops, questions and frisks." [289] However, plaintiffs argue that while the City may have such systems and policies in place, the reality of what occurs is far different. Citing the testimony of numerous officers, plaintiffs maintain that there is a stark difference between the City's policies and its practices regarding oversight of the constitutionality of stops.

Defendants contend that there is no evidence to suggest that the City has been deliberately indifferent, as opposed to merely negligent, with respect to training, supervising or disciplining the defendant officers.[290] They argue that "a lack of specific recollection of training by certain officers" is not equivalent to "an actual lack of training." [291] While evidence that a particular officer's training has been inadequate will not suffice to defeat a motion for summary judgment, plaintiffs have submitted enough evidence to put this material fact in dispute.

For example, even though racial profiling material is included in the written curriculum, it is disputed whether or not officers receive adequate instruction on the topic. Plaintiffs have submitted the testimony of numerous officers who do not recall receiving any such training. Many officers' explanations of the Department's Racial Profiling Policy—to the extent that they were aware that such a policy existed—was "we don't do it." [292] "It" meaning racial profiling—was explained by one officer, in words echoed by others, as "judging

---

**287.** *United States v. City of N.Y.,* 683 F.Supp.2d 225, 266–67 (E.D.N.Y.2010).

**288.** *See* Def. Mem. at 12.

**289.** *Id.*

**290.** *Id.* at 16.

**291.** Reply Mem. at 10.

**292.** Testimony of Officer Dang, Ex. X to Reply Decl., 13:8–10.

454

people by race, color ... clothing."[293] Notably, certain senior NYPD officials—including Inspector Dwayne Montgomery, former 28th Precinct Commander, and Deputy Commissioner Julie L. Schwartz, head of the Department Advocate's Office ("DAO")—were *unaware of the existence* of the NYPD's Racial Profiling Policy.[294] Additionally, plaintiffs have submitted evidence that racial profiling has *never* been discussed at CompStat meetings, despite the fact that such discussions are mandated by the Department's Racial Profiling Policy.[295]

Plaintiffs also argue that officers have not been sufficiently trained on the law of reasonable suspicion and SQF procedures. However, based on the transcript excerpts, it would be more accurate to say that certain of the deposed officers lack a *robust* understanding of the law of reasonable suspicion. That is, officers can parrot the somewhat circular definition of reasonable suspicion as "reasonable suspicion that a crime has been, is being, or is about to be committed,"[296] but seem unable to articulate what would lead them to find that reasonable suspicion existed in a given circumstance. Of course, that may be a result of the way the question was phrased by plaintiffs' counsel. It is not entirely clear whether the officers were asked in each instance to elaborate, once they gave the basic definition of reasonable suspicion.

Nonetheless, I cannot ignore the testimony of Deputy Commissioner Schwartz, in which she stated that she does not believe the law of search and seizure is clear under *DeBour*, the seminal 1976 New York case establishing four levels of police intrusion, because of "[t]he fact that there is a plethora of appellate division cases that modify and/or further explain the case."[297] If a high-ranking NYPD official in charge of discipline does not know about the existence of the Department's Racial Profiling Policy and does not believe that NYPD officers have a clear constitutional mandate regarding stops and frisks, it is difficult to imagine how the Department's disciplinary practices would be adequate to enforce the Racial Profiling Policy or to ensure that its officers are conducting constitutional stops.

This is all the more so because racial profiling is *not* as simple as not judging a

**293.** Testimony of Officer Edy, Ex. X to Reply Decl., 195:7–10.

**294.** *See* Montgomery Tr. at 124:9–125:24, 130:3–16 (testifying, as commander of the 28th Precinct from 2005 through 2009, that he did not recall ever having been provided with a copy of the NYPD's Racial Profiling Policy, but that he has "common sense;" that he did not recall a copy of the policy being kept at the 28th Precinct; that he had "never seen" the policy and "was unaware of this written policy"); Testimony of Deputy Commissioner Julie L. Schwartz ("Schwartz Tr."), Ex. 132 to Charney Decl., at 214:22–216:13 (testifying "I don't know that there is a ... NYPD ... racial profiling policy" and that she has never seen a racial profiling policy in the NYPD).

**295.** *See* PAF ¶ 53 (citing Deposition of Assistant Chief Raymond Diaz, Ex. 45 to Charney

Decl., at 112:8–14; Deposition of Inspector Steven Mauriello, Ex. 44 to Charney Decl., at 50:6–9; Ortiz Tr. at 199:10–13).

**296.** *See* n. 297 *infra*.

**297.** Schwartz Tr. at 212:18–213:19. This assertion is all the more bizarre as stops and frisks are not only guided by case law in New York but have been incorporated in statutory law. A warrantless stop is justified "when [an officer] reasonably suspects that [a] person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor...." N.Y.Crim. Proc. Law § 140.50(1) (2007). Frisks are justified when an officer "reasonably suspects that he is in danger of physical injury...." *Id.* § 140.50(3).

person on their appearance or as having "common sense." As Fagan notes:

> A number of visual processing studies conducted in the wake of the 1999 Amadou Diallo shooting, using both undergraduates and police officers as subjects, indicate that seeing black faces influences the interpretation of crime-relevant objects. This appears to be a pervasive psychological phenomenon that operates at an implicit level, making it a difficult but not impossible problem to eradicate.[298]

In the face of such complex social and psychological dynamics, I cannot say that the measures defendants have purportedly taken to train and supervise their officers on racial profiling and the law of reasonable suspicion are sufficiently complete as to warrant an award of summary judgment.

As another example of the City's deliberate indifference, plaintiffs point out that NYPD supervisors conduct only a cursory review of UF250s and that the City's audit procedures are equally cursory, thus failing to ensure the constitutionality of stops.[299] Defendants argue that the UF250 forms were designed to capture precisely the information relevant to a stop's constitutionality. Thus, "[s]ince the checked boxes represent a substantive justification for a stop, the audit confirms that a UF250 with the required checkmarks indicates a valid stop, absent indicia to the contrary on the remainder of the form."[300]

However, plaintiffs present convincing arguments and evidence that there are several shortcomings in the City's approach. *First*, plaintiffs contest defendants' characterization of the UF250 forms as sufficient to establish the constitutionality of the stop, when considered in isolation (without, for example, comparison to the officer's memo book, or conversation

---

**298.** Fagan Report at 100 (citing Jennifer L. Eberhardt, Valerie J. Purdie, Phillip Atiba Goff and Paul G. Davies, "Seeing Black: Race, Crime, and Visual Processing," 87 *Journal of Personality and Social Psychology* 876 (2004); Joshua Correll, Bernd Wittenbrink, Bernadette Park and Charles M. Judd, Melody S. Sadler, and Tracie Keesee, "Across the Thin Blue Line: Police Officers and Racial Bias in the Decision to Shoot," 92 *Journal of Personality and Social Psychology* 1006 (2007)). Fagan makes a similar point with regard to post-stop outcomes, writing, "[D]emeanor does matter in police-citizen encounters. It is one thing to be stopped and to have a mutually respectful exchange with an officer, it is quite another to be frisked, searched, thrown against the pavement or arrested.... [T]he decision to frisk, search, use force, or to arrest a suspect is highly contingent on actual interactions between officer and pedestrian. Subtleties in these interactions are largely lost in the data, rendering conclusions based on these data incomplete and highly speculative. 'For example, a racial group might be disproportionately searched if members of that group were disproportionately antagonistic or disrespectful toward police.' Yet it may be that members of that racial group are disproportionately antagonistic or disrespectful because the police treat them initially with greater suspicion and disregard. An officer's prior experiences with members of that racial group, however, may warrant greater suspicion from his perspective, and so on. The speculative cycle cannot be resolved with these data. Behaviors and exchanges within stop encounters are largely unobserved in the data." *Id.* at 97–98 (citing Robin Shepard Engel et al., "Further Exploration of The Demeanor Hypothesis: The Interaction Effect of Suspects' Characteristics and Demeanor on Police Behavior," 17 *Justice Quarterly* 235 (2000); Roger G. Dunham and Geoffrey P. Alpert, "Officer and Suspect Demeanor: A Qualitative Analysis of Change," 12 *Police Quarterly* 6 (2009); and quoting Ian Ayres and Jonathan Borowsky, A study of Racially Disparate Outcomes in the Los Angeles Police Department, at 5 (Oct. 2008), available at http://www.aclu-sc.org/documents/view/47).

**299.** *See* Opp. Mem. at 21–23.

**300.** Def. Mem. at 13 n. 14.

with the officer).[301] *Second,* they present evidence that even when the QAD audits reveal inadequacies, the Department does not follow up with sufficient disciplinary or remedial measures.[302] *Third,* Fagan's study indicates that, regardless of what the audit reveals, the fact is that a significant number of UF250 forms are not adequately completed.[303] This is certainly enough evidence to demonstrate a triable issue of fact as to whether the City's efforts in this regard can overcome a finding of deliberate indifference.

I have discussed the evidence regarding the Racial Profiling Policy and UF250 forms and audits as examples of the training, supervision, monitoring and disciplinary procedures that defendants argue demonstrate the City's diligence, and the substantial deficiencies in these efforts that plaintiffs argue demonstrate the City's deliberate indifference. This is clearly not a situation in which the City has taken *no* remedial steps. Nonetheless, considering the statistical evidence in conjunction with the narrative evidence of significant shortcomings in the ways that the City's policies have been put into practice, I find that there is a triable issue of fact as to whether the NYPD leadership has been deliberately indifferent to the need to train, monitor, supervise, and discipline its officers adequately in order to prevent a widespread pattern of suspicionless and race-based stops. I therefore deny defendants' summary judgment motion on plaintiffs' failure to train, supervise, monitor, and discipline claims against the City.

### D. Plaintiffs' Title VI Claims Against the City

The standard of proof for Title VI is the same as for a racial discrimination claim under the Equal Protection Clause of the Fourteenth Amendment.[304] Accordingly, I deny defendants' summary judgment motion on plaintiffs' Title VI claims against the City for the same reasons stated above with respect to plaintiffs' Equal Protection claims.

### E. Plaintiffs' Claims Against Bloomberg and Kelly

Plaintiffs have not opposed defendants' motion for summary judgment on their claims against Mayor Bloomberg and NYPD Commissioner Kelly. Accordingly, I grant summary judgment to defendants on those claims.

## V. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. The Clerk of the Court is directed to close this motion [Docket No. 134]. A conference is scheduled for September 23, 2011 at 4 p.m.

SO ORDERED.

---

**301.** *See* Opp. Mem. at 21.

**302.** *See id.* at 22–23.

**303.** *See* Fagan Report at 4.

**304.** *See United States v. Fordice,* 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) ("the reach of Title VI's protection extends no further than the Fourteenth Amendment"); *Lora v. Board of Educ. of the City of N.Y.,* 623 F.2d 248, 250 (2d Cir.1980) ("The standard of discrimination in Title VI is the same standard the Supreme Court establishes for discrimination under the Fifth and Fourteenth Amendments.").